CHARLES M. THOMSON, TRUSTEE, APPELLANT, V. NEBRASKA STATE RAILWAY COMMISSION, APPELLEE.

4 N. W. (2d) 756

FILED JULY 3, 1942. No. 31429.

*Wymer Dressler* and *Robert D. Neely,* for appellant.

*Walter R. Johnson, Attorney General, Edwin Vail* and *James C. Quigley, contra.*

Heard before ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

This is an appeal from an order of the Nebraska state railway commission, denying the Chicago & Northwestern Railway Company authority to discontinue the station agent at Nenzel, Nebraska, and substitute therefor a caretaker. On October 18, 1941, the appellant filed with the Nebraska state railway commission an application, containing certain facts with reference to the business at the Nenzel station and the revenues collected and expenses of maintaining an agent, and praying for the right to discontinue the services of the agent and substitute therefor a caretaker. The matter was heard at Valentine, Nebraska, before the railway commission on December 4, 1941. On January 2, 1942, the commission entered an order denying the application. On January 12, 1942, the applicant filed a motion for rehearing, which was denied January 28, 1942, and on February 18, 1942, applicant filed with the commission notice of intention to appeal and a cost bond which was duly approved. The case comes here for review on the record.

The record discloses that the incorporated village of Nenzel, with a population of 125, is 7.6 miles east of Cody, Nebraska, and 8 miles west of Kilgore, Nebraska, in Cherry county. The chief traveling auditor of the railroad prepared exhibits containing statistics as to revenues and traf-

fic expenses of the station, which are found in the record as exhibits 1 to 6, inclusive. The exhibits were prepared on the basis first of gross revenue. They likewise contain the subject of the traffic received and forwarded, and show items and the expense of operating the station with an agent; then a comparison of such expense with that of the average station on the whole system. Exhibit 1 is a statement of the gross revenue as follows: In 1937, $14,899.27; in 1938, $10,-415.19; in 1939, $7,699.52; in 1940, $10,987.88; in the first eight months of 1941, $3,211.55. Exhibit 1-A shows gross revenue $833.58; local revenue $387.36; gross passenger revenue $70.21, for the period of September and October, 1941.

Exhibit 2, having to do with the traffic involved, shows the following: 1937, 132 carloads received, 79 of which contained gravel for road-building; 1938, 47 carloads received consisting of corn, coal, cotton seed cake, feed, etc.; 1939, 43 carloads received, consisting of cotton seed cake, coal, posts, feed, etc.; 1940, 84 carloads received, of which 34 cars contained gravel and 15 cars asphalt for road-building; the first eight months of 1941, 14 carloads received, of which seven were coal, two posts, four cotton seed cake, and one gravel. Outbound movement of L. C. L. (less carload lots) and carload traffic: 1937, 20 cars of cattle, one car of hay; 1938, five cars of cattle; 1939, eight cars of cattle; 1940, two cars of cattle; and the first eight months of 1941, one car of cattle; September and October, 1941, three cars of cotton seed cake and four cars of cattle received. Exhibit 2 shows L. C. L. to average less than one shipment per day on the "received" and one shipment every four days on the "forwarded."

Exhibit 3 is a statement of the station expenses from 1937 to and including August, 1941, under the heading "Station Labor," which means the agent's salary: 1937, $982.64; 1938, $1,047.61; 1939, $1,067.94; 1940, $1,396.50; first eight months of 1941, $882.89. Social security and railroad taxes: 1937, $58.96; 1938, $62.86; 1939, $64.08; 1940, $83.79; first eight months of 1941, $52.97. The exhibit also contains the fuel items, cost of handling the social security, and railroad

taxes, building maintenance, again social security and railroad tax, stationery and supplies, making a total amount for all: 1937, $1,197.87; 1938, $1,154.73; 1939, $1,161.70; 1940, $1,615.07; first eight months of 1941, $956.03, and for the months of September and October, 1941, total expense, as shown by items above, $273.93.

Exhibit 4 is a comparison of the station expenses with the average station expense on the system, as follows: Revenues assigned to station: 1937, $6,657.98; 1938, $4,600.32; 1939, $3,437.54; 1940, $4,600.09; first eight months of 1941, $1,-463.54. Per cent. station expense to revenues: 1937, 17.99; 1938, 25.10; 1939, 33.79; 1940, 35.11; first eight months of 1941, 65.32. (For example, it required the above percentages of the gross revenues at Nenzel to pay the agent's salary.) As compared with the per cent. station expense to revenues system: 1937, 8.30; 1938, 8.89; 1939, 8.62; 1940, 8.27; first eight months of 1941, 7.52.

Exhibit 5 shows revenues assigned to the station at Nenzel: Local freight (50%); interline freight (75%); miscellaneous freight (100%): 1937, total $10,531.22, assigned $6,262.54; 1938, total $6,651.52, assigned $4,150.06; 1939, total $4,787.71, assigned $3,045.29; 1940, total $6,267.17, assigned $4,210.80; January to August, 1941, inclusive, total $1,601.57, assigned $1,136.51. The exhibit further shows passenger (100%): 1937, total $297.32, assigned same amount; 1938, total $316.11, assigned same amount; 1939 total $294.74, assigned same; 1940, total $289.87, assigned same; January to August, 1941, inclusive, total $261.31, assigned same. Express (22%): 1937, $446.02, assigned $98.12; 1938, $609.78, assigned $134.15; 1939, $443.22, assigned $97.51; 1940, $451.89, assigned $99.42; January to August, 1941, inclusive, $298.71, assigned $65.72. Leases (0%): 1937, total $70; 1938, $12; 1939, $10; 1940, $10; January to August, 1941, inclusive, $10. Total revenues: 1937, $11,344.56, assigned $6,657.98; 1938, $7,589.41; assigned $4,600.32; 1939, $5,535.67, assigned $3,437.54; 1940, $7,018.93, assigned $4,600.09; January to August, 1941, inclusive, $2,171.59, assigned $1,463.54.

Due to the fact that there are two stations involved in every shipment, it is necessary that each station be credited with one-half of the gross revenue; the interline revenue assigned on the basis of 75 per cent. for the reason that 25 per cent. should be assigned to the junction point, since that requires work in handling the shipment. The 100 per cent. of passenger revenues is assigned to the station for the reason that it is thought the return trip will give to the other destination its correct proportion. The express earnings are assigned on the actual basis. The express agency is an independent agency owned by the railroad and 22 per cent. of its earnings was paid to the railroad.

Exhibit 6 shows the number of days per carload shipment and less than carload shipments received and forwarded to Nenzel under carload number of days per shipment: 1937, 2.0; 1938, 5.87; 1939, 6.0; 1940, 3.57; January to August, 1941, inclusive, 13.60; and under less carload, number of days per shipment: 1937, .89; 1938, .74; 1939, .80; 1940, 1.03; January to August, 1941, inclusive, 1.15. (This exhibit shows the number of days required to accumulate a carload shipment and also an L. C. L. shipment. For example: In 1940 it took a trifle over three and one-half days to get a carload shipment and a little more than one day to get an L. C. L. shipment throughout the year. In 1941 it took 13.60 days to get a carload or forward a carload, and 1.15 days for the L. C. L. shipment.)

Referring to exhibit 1, the railroad revenue is broken down into carload and L. C. L., which shows: 1937, the carload business was $1,306.58, while the L. C. L. was $55.21, that is, for freight forwarded; for freight received, the carload was $8,340.22 and L. C. L. $804.50, about 90 per cent. carload. In 1940, freight received amounted to $5,350.38 a carload, while L. C. L. was $693.34, or about 88 per cent. carload. The freight forwarded amounted to less than $100 on either account. The first eight months of 1941 show revenue from freight forwarded $42.90 carload, and $15.11 L. C. L. This is all the outgoing business for this period. The freight received shows $1,176.93 carload, and $364.15 L. C. L.

If the agent's services are terminated and a caretaker substituted, freight will be received prepaid; patrons will communicate with the station agent at either Cody or Kilgore; telephone communications will remain from Nenzel to such other stations, and the agents thereof, depending upon the direction of the movement, will sign the bill of lading or live stock contract as the case may be. Most business is inbound and in carloads. The cars could be spotted by a caretaker as well as by an agent. Road-building material is usually handled on spur tracks, where there is no agent or station; the train crews spot the cars each day when loading is desired, and in the evening they pull the cars away. With reference to coal, the freight charges would be paid by the dealer in his invoice, rather than to the local agent. If stock feed, such as cotton seed cake, is received, with draft attached, the car would be hauled to the next station, and upon surrender of the bill of lading it would be spotted in the usual way. As to the express, the train crew would put it in the warehouse which is kept locked, and it would be delivered to the customer by the caretaker. With reference to government shipments, if such shipments were received collect, they would be held at the last open station before reaching Nenzel, and the consignee notified, and shipments delivered in the usual way. If there is telephone connection, the consignee would be notified. In the event of receipt of cotton seed cake C. O. D., the shipment would be billed to the last open station, and the party receiving the shipment would do business with the agent at such station, or the shipment could be billed to Nenzel and the agent at the next station east would notify the consignee, and when the bill of lading was taken up, the shipment would then be forwarded to the station at Nenzel for unloading. This is not an uncommon practice in large cities. Inspection, if authorized, could be made at the last open station before reaching Nenzel.

The division superintendent testified: Nenzel has a population of 125, a general store, another grocery, a poultry and egg concern, and a filling station which receives its oil and

gas by truck. The patrons are mostly ranchmen. Nenzel is on paved highway No. 20, which runs across the state. The railroad facilities consist of a depot, without living quarters; farming in the community is negligible; just enough feed is grown for the horses; grain is not shipped out. The stockyards consist of two or three pens and a loading chute and lack water facilities; cattle constitute the only live stock shipped. There are some privately owned coal bins on leased ground. The railroad tracks consist of the main line, a passing track and a house track. If the agent is removed, a caretaker can be employed for about $10 a month, annual expense thereof being $120, as compared with $1,400 at present. The stations of Cody and Kilgore are heavier stock-shipping points; the stockyards in each town are provided with other facilities, and scales are provided at Cody. Freight is calculated on destination weight, as far as live stock is concerned; there are no scales at Nenzel. Passenger service consists of one train each way daily, going west in the morning and back at night. The passengers can pay their fare on the train from Nenzel. They do so now on the east-bound train, because there is only a part-time agent, who is not a telegraph operator, and he is not on duty when the east-bound passenger train goes through. All Western Union messages are now sent either to Kilgore or Cody and telephoned to the ranchers. The agent serves six hours a day, from 8 to 11 and 12:30 to 3:30 o'clock.

The protestants offered the testimony of Edward Arnold, a rancher, who, with his father, had operated a ranch for 30 or 40 years in the vicinity of Nenzel. The witness testified that he shipped a load or two of cattle each year out of Nenzel; that they probably had 35 carloads a year, the greater part of them going into central and eastern Iowa and some into Illinois, and they are shipped from Cody and Kilgore, because the scales are available at such places; that, if the same facilities existed at Nenzel, it would obtain 75 per cent. of the business; that the cause for the reduction in revenue at Nenzel was the agent who preceded the one now in charge, in not attending to business. This witness favored

rail shipping, but testified: "We've been shipping practically everything by truck. At the present time, we have some orders in Omaha, I don't know what their weight will amount to—probably 10,000 or 15,000 pounds; they were ordered to be filled at the company's convenience, whenever they could get them filled; probably amount to 20,000 or 25,000 pounds by the time we get it all together." Witness stated he expected to have six or seven cars in, consisting of feed, in the next 30 days; that last year his concern paid $1,700 in freight to trucks. He lives 11 miles north of Nenzel, and his ranch is 14 miles from Kilgore. In the past year he has paid $25 or $50 to the railroad. The cattle going to Iowa are delivered to the purchaser at Cody; cattle to go to market are shipped from Cody or Kilgore and "once in a while from Nenzel." The truckers come to the ranch and pick up the stock, thus doing away with driving the stock to the railroad stockyards. Stock shipped from Cody by rail is driven in. Truckers solicit business; they ship into Iowa and sometimes into Illinois, going a distance of 800 or 900 miles; in such case the purchaser pays the freight. The truckers usually take four or five trucks. The trucker comes to the ranch, the cattle are weighed at the town scales; when shipped by rail the cattle are not weighed at the ranch.

The witness John G. Lord, a forest ranger, lives 19 miles south of Nenzel on the Nebraska National Forest. He receives some shipments, consisting mostly of creosote, which comes in each year, posts and wire, government shipments. The witness testified that if the services of the agent at Nenzel were terminated he would have to go to Cody or Kilgore to handle the bills of lading. This would amount to about a 20-mile trip each time. In going to Cody or Kilgore he goes to Nenzel first and then takes the highway. He is paid mileage by the government.

Witness Graydon D. White lives in Nenzel and is employed by the Joe Satterlee general merchandise store, having a stock of about $15,000 to $18,000. He testified that, if the agent were removed at Nenzel, people would go elsewhere to trade; he believed he would get credit from the

mines for the invoice of the coal, but doubted if the mines would want to give credit for the freight charge which he paid to the agent at Nenzel. He admitted he could pay the agent at Kilgore just as well. His banking business is done at Kilgore, and if the coal comes prepaid it would not inconvenience him very much. He stated that if they had had the right kind of agent at Nenzel there would have been less trucking and more railroad business; that the store ships by truck to some extent.

Another witness, Elvin Adamson, lives 22 miles south of Nenzel; has been in the ranching business since 1913. He stated it would be inconvenient to receive cotton seed cake at Nenzel if there were no agent there; they would have to go to Cody or Kilgore to take up the draft; that his shipments were mostly made from Cody, but if they had better facilities at Nenzel he thought they would be made from there. On cross-examination, he testified that when he received a shipment of cotton seed cake, with sight draft attached, it goes to the bank at Cody; that before he obtains the shipment he has to arrange by telephone with the bank at Cody to take care of it. His testimony was to the effect that if Nenzel had better facilities business would go there instead of to Cody.

Exhibit 7 shows station revenues at Nenzel, freight and passenger, for the years from 1917 to 1936, inclusive, making a grand total for 20 years of $253,384.41, with a 20-year average revenue of $12,669.22. The items for each year are: "Freight Forwarded," "Revenue L. C. L.," "Revenue C. L.;" "Freight Received," "Revenue L. C. L." "Revenue C. L.;" "Ticket Sales," "Conductors Cash Ticket Collections;" state and interstate, by authority of the N. S. R. C.

The only assignment of error necessary to a determination of this case is whether or not the order of the railway commission is arbitrary and not sustained by sufficient evidence. In determining whether the railroad should be allowed to discontinue its agent at a particular station, each case is dependent on its own facts and circumstances.

In *New York Central R. Co. v. Public Utilities Commis-*

*sion,* 123 Ohio St. 560, 176 N. E. 219, the court held: "In determining the question whether a railroad company may change one of its stations from an agency to a nonagency or prepay station, each case must be determined upon the peculiar facts attendant thereon. The volume of business done at such station, its proximity to other stations, the accessibility thereof, the cost of maintaining such agency station, the financial loss, if any, to the railroad company, due regard for the welfare of the public and the cost of operating such service, and probabilities of future development are all circumstances to be taken into consideration."

It is apparent that the volume of business transacted at Nenzel is such that the agent may be readily dispensed with; the protestants showing that the necessity for an agent is based on the proposition that the former agent was unsatisfactory in that he did not attend to business, and, further, that if the facilities of the station were improved by retaining the agent now serving the business would improve. This, of course, is founded upon pure speculation. As to the future business to be conducted at this station by virtue of the war, it is too speculative to be considered and too perplexing to be analyzed at this time.

It is a matter of common knowledge that the highway transportation facilities throughout the state and nation make the accommodations for shipment by trucks easy and delivery of freight by truck much simpler than by rail. The trucks make the loading at the home of the shipper, thus dispensing with considerable extra labor on the part of the shipper; especially is this true where live stock deliveries are made direct to the home. Bus travel on the highway is such that a bus is ordinarily obtainable more readily than passenger service on trains. Railroads are subject to strict regulation, and highway competition is not so subjected. Common-carrier trucks compete with the railroads for L. C. L. and short-haul business, and manufacturers and wholesale houses have, in many instances, put on their own fleet of trucks and compete not only with the railroads, but with the common-carrier trucks as well. The decline of business

on the railroads for the last decade can be easily accounted for.

An analysis of the record, in conformity with the holding in *New York Central R. Co. v. Public Utilities Commission, supra,* makes the following decisions applicable in the instant case:

In *Atchison, T. & S. F. Ry. Co. v. State,* 189 Okla. 485, 118 Pac. (2d) 202, the court held:

"The facilities to be furnished at any station need only be adequate to the requirement of said station, and should be in a measure commensurate with the patronage and receipts from that portion of the public to whom the service is rendered.

"It is not reasonable to require the maintenance of a full-time agency station when the cost of such service is out of proportion to the revenue derived from that portion of the * * * public benefited thereby, especially where a substitute service may be provided which will afford the same essential service but is less convenient." See, also, *Lowden v. State,* 189 Okla. 491, 118 Pac. (2d) 238, and *Lowden v. State,* 189 Okla. 495, 118 Pac. (2d) 242. The court in the latter case held:

"Where upon consideration of all of the pertinent circumstances there appears to be no necessity for the maintenance of a regular agent at a particular railroad station and the cost thereof is so great as compared with the additional convenience thereby afforded the public and the revenue derived therefrom that it clearly appears unreasonable to require the railroad to continue the agent's services, an order of the Corporation Commission making such a requirement will be vacated."

We conclude that in the instant case the order of the state railway commission is arbitrary and not sustained by sufficient evidence. It is hereby vacated and the application of the appellant trustee sustained. As to any future considerations demanding the services of an agent at Nenzel, this matter may be properly determined when the occasion arises.

JUDGMENT ACCORDINGLY.