# Staunton

## ATLANTIC COAST LINE RAILROAD CO. v. COMMONWEALTH OF VIRGINIA, EX REL. STATE CORPORATION COMMISSION.

September 6, 1950.

Record No. 3693.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*J. M. Townsend* and *Morton G. Goode*, for the appellant.

*J. Lindsay Almond, Jr., Attorney General,* and *Walter E. Rogers, Assistant Attorney General,* and *William C. Seibert,* for the appellee.

HUDGINS, C. J., delivered the opinion of the court.

This is an appeal from an order of the State Corporation Commission denying a request of the Atlantic Coast Line Railroad Company, hereinafter designated "appellant," authority to close its station at Carson as an agency station.

Appellant contends that the action of the Commission is unreasonable, unjust, arbitrary and amounted to confiscation of its property.

Carson is a station on appellant's interstate railway line in Dinwiddie county. It is 6.2 miles north of the agency station at Stony Creek, and 8.9 miles south of Collier Yard, which is immediately south of Petersburg. According to a survey and plot there are 72 buildings within a radius of 3200 feet of Carson. A recent census discloses that the population in this area comprises 87 children and 139 adults owning 45 automobiles and 11 trucks. This is an agricultural community, the principal crops grown being cotton, corn, tobacco and peanuts.

Appellant operates a number of freight trains over its line passing this station, but most of the business is handled by two local freight trains, one north- and the other south-bound. Carson is also served by two local passenger trains, one north- and the other south-bound. Only one man,

who is on duty eight hours a day five days a week, is employed as the agent to conduct the local business for appellant. Inbound shipments constitute the greater part of appellant's business in this area. For the year ending February 28, 1948, car-load shipments totaled 51, 48 of which were consigned to P. B. Halligan & Company. Less than car-load shipments totaled 182 parcels, 106 of which were consigned to the same company—that is, 94% of car-load shipments and 58% of less than car-load shipments were consigned to one company.

During the same period appellant transported 29 passengers to and from Carson—an average of less than two and a half passengers per month.

Appellant's application is to discontinue the agency at Carson and maintain it as a prepay station. The actual transportation service will be the same—that is, the two local passenger trains will continue to stop and pick up passengers as at present. The only difference being that passengers will purchase tickets from the conductor after boarding the train. The local freight trains will continue to stop and pick up freight. Inbound car-load shipments will be placed on the siding and the consignee notified of delivery. Orders for empty cars will be put in a box placed in the station, or telephoned, toll free, to Stony Creek. Less than car-load shipments will be put in the station building. Financially responsible shippers may, if they so desire, arrange for credit and have the charges billed to them.

This type of service is not as convenient to the public as an agency station. The precise question presented is whether, in view of all the circumstances, it is reasonable and just to compel appellant, at a substantial loss, to continue the more convenient service.

It is stated in the opinion of the Commission "that the receipts at the station shown by the exhibits are the Coast Line's share of the gross receipts after dividing with connecting carriers. The Commission has not considered the expenses of earning these revenues other than the actual

out-of-pocket expense of maintaining an agent at Carson. It is impossible to determine by accurate cost accounting what a railroad earns or loses at a particular station."

The evidence discloses that within the limits outlined in the foregoing excerpt from the opinion, the revenue received and the expense of maintaining Carson as an agency station during different periods from 1940 to 1949 were as follows: The average annual revenues received for the three-year period from 1940 to 1942 were $1988.15, and the annual salary paid the agent at Carson for the same period was $1992.00—that is, a loss of $3.85 per annum. For the year ending April 30, 1947, receipts totaled $2829.13, and the expenditures totaled $3104.28, a loss of $275.15. The total receipts for the year ending February 28, 1949, were $2993.89, and the expenditures were $3-456.75, or a loss of $462.86. Over the nine-year period there was a slight increase in receipts, but the expense of maintaining the station increased in greater proportion.

The salary of the agent and the reasonable expenditure for lights, heat, vacation pay and unemployment insurance, are the items of expenditure necessary to maintain the agency station. The salary of the agent is the minimum salary paid for the type of work performed. This is fixed by contract made with the union on a national basis. An agent could perform the required duties in less than an hour a day, but it is claimed that the union who made the contract with appellant for the compensation of its employees will not agree for appellant to employ any one on a part-time basis. On this point, the Commission said: "The agents at these small stations work only a few hours a week and the railroads could employ persons ready, able and willing to do the necessary work for much lower pay than that the agents now get. The economies that would result from employing commission agents are prevented by the contracts between the companies and the unions. The only choice left to a railroad seeking economy is to do away with the agent altogether."

A part time employee, in the nature of a caretaker, or an agent on commission, would, in all probability, furnish all the service adequate and necessary for the public convenience in the area served by this station. However, the Commission found as a fact, that appellant was unable to furnish this modified service without a breach of its contract with the labor union. This finding is binding upon this Court.

The Commission is charged, by Section 156(b) of the Constitution, with the "duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties * * * and shall require them to establish and maintain all such public service facilities and convenience as may be reasonable and just * * *."

Any interested party may appeal as a matter of right from an adverse ruling of the Commission. On such appeal this Court is required to "consider and determine the reasonableness and justness of the action of the commission * * * provided, however, that the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct * * *." (Sec. 156(f) Const.)

No formula has been devised by which to determine in all cases the exact meaning of the phrase "facilities and convenience as may be reasonable and just." Mr. Justice Peckham, dealing with a similar expression, in *Atlantic Coast Line R. Co.* v. *Wharton*, 207 U. S. 328, at p. 335, 28 S. Ct. 121, 52 L. ed. 230, said: "The term 'adequate or reasonable facilities' is not in its nature capable of exact definition. It is a relative expression, and had to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost. * * *"

In *Southern Ry. Co.* v. *Public Service Comm.*, 195 S. C.

247, 10 S. E. (2) 769, 775, the South Carolina court, after quoting the above excerpt, said: "It is thus apparent that the Supreme Court of the United States recognizes that while a railroad company is required to provide adequate or reasonable facilities, this cannot be construed to mean that the same facilities shall be provided at every point regardless of public patronage or the incidental cost of such facilities."

A three-judge Federal District Court for the Eastern District of South Carolina, in *Atlantic Coast Line R. Co.* v. *Public Service Comm.*, 77 F. Supp. 675, 684, said: "The controlling criteria as we see it are these, the character and population of the territory served, the public patronage, or lack of it, the facilities remaining, the expense of operation as compared with revenue from same, and the operations of the carrier as a whole."

There are no manufacturing or processing plants in the Carson area. It is in the midst of an agricultural section, with a limited population, as heretofore shown. It is served by two hard-surfaced highways, extending north and south, used by five north-bound and seven south-bound passenger buses, all of which stop at Carson. There is a daily (except Sunday) freight service by truck. Many wholesale dealers, operating from Petersburg and elsewhere, make freight delivery by their own trucks. These are additional facts to be considered in determining the reasonableness and justness of the action of the Commission.

An interstate carrier must conform to the rules and regulations prescribed by the Interstate Commerce Commission as well as the State regulatory bodies, such as the State Corporation Commission of Virginia, the Public Service Commission of South Carolina, and similar bodies in other States traversed by its line. A railroad company has no power to fix rates and hence has little control over its revenue. Likewise, its control of expenses, particularly wages, is limited by reason of the fact it is under obligation to make contracts for its employees with well organized and

nation-wide labor organizations. It is in competition with the bus, truck lines, and private automobiles which travel over highways built, not by private capital, as is the case with rail carriers, but by public expenditures. As was said in *Atlantic Coast Line R. Co.* v. *Public Service Comm.,* *supra,* "In such circumstances it is the duty of the carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed nor used by the public to any substantial extent."

As heretofore stated, the outbound business at Carson is negligible and the Halligan Company received 76% of the inbound business. This company operates a general merchandise store across the road from the station. If the proposed substituted service is permitted, the only inconvenience to this company would be that it would deal with an agent at Stony Creek, or Petersburg, by telephone, toll free, instead of walking across the road and dealing with an agent at Carson. It can arrange to have freight charged to its account and pay by check mailed to the agent at Stony Creek. The testimony of other patrons of appellant's line at Carson reveals that there is little, if any, necessity to maintain the agency station so far as they are concerned. This being the situation the comparative inconvenience to one merchant hardly justifies the expenditure necessary to maintain Carson as an agency station.

The Supreme Court of Illinois, dealing with a similar situation, in *Illinois Cent. R. Co.* v. *Illinois Commerce Comm.,* 399 Ill. 67, 77 N. E. (2d) 180, said: "'The test to be applied,' we noted in the case last cited, (*Illinois Cent. R. Co.* v. *Illinois Commerce Comm.,* 397 Ill. 399, 74 N. E. (2d) 893, 894) 'is whether the economic waste caused by the operation of the agency outweighs the benefits and convenience to the public.'"

In *Illinois Cent. R. Co.* v. *Illinois Commerce Comm.,* 397 Ill. 387, 74 N. E. (2d) 526, it is said: "On this railroad there are eighty single agency stations, and the effect of the decision of the Commission would be to require

appellee to keep each of these stations operating with an agent, at a loss, if as a whole, the utility makes a profit. When the statute refers to public convenience and necessity it does not mean the one or more persons that may be benefited at a particular locality, but it means the public generally, and, in determining the true public convenience, the effect of the order upon the whole public instead of a small part of the public should be taken into consideration."

The Commission, in giving its reasons for refusing the request, among other things, said: "The removal of a station agent is often followed by a petition for authority to remove the station, and the picture presented over the years is that of the gradual dismantling of railroad properties. The closing of many small stations is inevitable and a station once closed is seldom reopened. The regular practice of the Commission has been not to authorize the closing of an agency station unless the out-of-pocket annual loss is greater that it is in the present case."

The discontinuance of the agent at Carson may or may not bring about the conditions anticipated in the foregoing excerpt. However, the question which confronts the court is, whether considering all the circumstances, the additional inconvenience to the public at Carson is sufficient to compel appellant to continue operating an agency station at a loss which the evidence shows has consistently increased during the past several years.

The Commission cited, and seems to have relied in a great measure upon, the opinion of Mr. Justice Brandeis in *Fort Smith Light, etc., Co.* v. *Bourland*, 267 U. S. 330, 45 S. Ct. 249, 69 L. ed. 631, who said: "A public utility cannot, because of loss, escape obligations voluntarily assumed. * * * The fact that the company must make a large expenditure in relaying its tracks does not render the order void. Nor does the expected deficit from operation affect its validity. A railway may be compelled to continue the service of a branch or part of a line, although the operation involves a loss. * * * This is true even where the system as a whole fails to earn a fair return upon the value of the property."

The same principle was stated in somewhat different language in *People of State of New York* v. *McCall*, 245 U. S. 345, 38 S. Ct. 122, 124, 62 L. ed. 337, where, speaking of corporations which devote their property to a public use, it was said that such corporations "may not pick and choose, serving only the portions· of the territory covered by their franchises which it is presently profitable for them to serve and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render."

These statements apply to the performance of an absolute duty imposed upon a public service corporation. They do not apply to the performance of duties which are relative and not absolute. The distinction between the two duties is summarized in *Southern Ry. Co.* v. *Public Service Comm.*, *supra*, and in *Kurn* v. *State*, 175 Okl. 379, 52 P. (2d) 841, where it is said: "In performance of absolute duty by railway company, a question of expense is not to be considered, but, where duty sought to be enforced is one of additional convenience rather than necessity, question of expense to company and relative benefit to public is deciding factor, and may not be disregarded."

The basis of the rule seems to be so long as a railroad continues to exercise the privilege conferred by its charter, the State has the right to regulate its operations in the interest of the public and compel it to provide reasonably safe and adequate facilities for serving the public, even though the compliance be attended by some pecuniary disadvantage.

"A state often has many laws relating to railroads on its statute books which do not become a part of the charter contract—which are of such a nature that it is apparent the state could not have intended to make or exact a continuing and binding stipulation embodying their terms. Among such laws are those containing specific regulations respecting the * * * facilities for handling and moving traffic. * * *"

*Railroad Comm.* v. *Eastern Texas R. Co.*, 264 U. S. 79, 44 S. Ct. 247, 249, 68 L. ed. 569.

"Where, however, the proceeding is brought to compel a carrier to furnish a facility not included within its absolute duties, the question of expense is of more controlling importance. In determining the reasonableness of such an order, the court must consider all the facts,—the places and persons interested, the volume of business to be affected, the saving in time and expense to the shipper, as against the cost and loss to the carrier. On consideration of such and similar facts the question of public necessity and the reasonableness of the order must be determined." *Oregon R., etc., Co.* v. *Fairchild*, 224 U. S. 510, at p. 529, 32 S. Ct. 535, 56 L. ed. 863; *Atlantic Coast Line R. Co.* v. *North Carolina Corp. Comm.*, 206 U. S. 1, 27 S. Ct. 585, 51 L. ed. 933; *Missouri Pac. Ry. Co.* v. *Kansas*, 216 U. S. 262, 30 S. Ct. 330, 54 L. ed. 472; *Chesapeake, etc., R. Co.* v. *Public Service Comm.*, 242 U. S. 603, 37 S. Ct. 234, 61 L. ed. 520.

The relief sought by appellant in this case does not relate to the performance of one of its absolute duties, but to a relative duty only.

A similar question was before the Oklahoma court in *Kurn* v. *State*, 175 Okl. 379, 52 P. (2d) 841, where at p. 843, this is said: "The question before the Corporation Commission for determination was not whether the continuance of the Le Flore station as a full-time agency station would afford the patrons thereof a more convenient method of transacting business, but rather whether the substitution of a merchant agent or caretaker would furnish the public with facilities and conveniences reasonable and just. In arriving at a decision, the question of costs of the respective services, while not controlling, was an important factor in determining what was reasonable and just in the premises for, as we have said in the case of *St. Louis, etc., R. Co.* v. *Newell*, 25 Okl. 502, 106 P. 818, 820, 'The facilities afforded at any station to the general public must in a measure be commensurate with the patronage and receipts from that

portion of the public to whom the service is rendered,' and as we have likewise said in the case of *Chicago, etc., R. Co.* v. *State,* 24 Okl. 370, 103 P. 617, 620, 24 L. R. A. (N. S.) 393. 'Where the receipts at such stations will not justify the installing of such service, there being eliminated the question of the safety or expedition in the operation of trains, it would be unreasonable to require such service to be installed creating a deficit at such station to be borne by the receipts at a larger station, except in exceptional instances.' "

The foregoing excerpts from opinions of the highest courts in other jurisdictions and a number of cases cited indicate that the conditions confronting railroads in Virginia are the same as those confronting them in other States. The Virginia Commission recognizes this fact and usually applies the same general principles. For, in the opinion of the Commission in *Fleming* v. *Commonwealth, post,* p. 288, 61 S. E. (2d) 1, it is said: "The discontinuance of any long established service will inevitably cause inconvenience to some persons who have availed themselves of the service. The inconvenience which may be sustained must be offset by the need for such service, measured by the use of the facilities, the revenue received therefrom and the costs to the railroad company furnishing the service.

"While it must be accepted that to curtail passenger service will cause some inconvenience to the communities along the line of the railroad, nevertheless, conditions, circumstances and modes of travel have vastly changed during the period of this operation, and the railroad company should not be required to continue such service at the continual and increasing loss as here shown."

While the loss to the railroad in the Fleming case was much greater than the loss established in this case, the difference is only one of degree. It was clearly established in both cases that the loss had been steadily increasing over a period of years with no prospect of diminishing the loss.

This Court, speaking through Mr. Justice Miller, in

*Lynchburg Traffic Bureau* v. *Commonwealth*, 189 Va. 612, at pp. 620, 623, 54 S. E. (2d) 66, said: "The scope of the powers accorded the Commission not only enables it to require the exercise and maintenance of adequate public service by a public service corporation, but authorizes it to relieve such company of the burden of public service when circumstances justify. Its broad and exclusive power in that respect was recognized and confirmed in *Portsmouth* v. *Virginia Ry., etc., Co., supra* [141 Va. 44, 126 S. E. 366].

\* \* \* \* \* \*

"Conditions, circumstances, means and modes of travel have vastly changed in comparatively recent years. Over a reasonable period of time, the area, communities and needs of the people served by this carrier have been materially affected by these changes. The availability of more and improved highways and the more extensive use of private automobiles and bus transportation have caused marked reduction in the need and demand for short-haul railway passenger service. The public does not now use this service along the route in question to such an extent or degree as to justify its continued rendition at the very considerable loss incurred."

We are required by the Constitution (sec. 156(f)) to regard the order of the Commission as "prima facie just, reasonable and correct." This we do; but we are also required to consider and determine the reasonableness and justness of the action of the Commission. There is no conflict in the evidence. Considering all the facts and circumstances, we cannot escape the conclusion that it would be unreasonable and unjust to require appellant to maintain Carson as an agency station when the cost of such service is out of proportion to the revenue derived from that portion of the public benefited thereby, especially where it is shown, as in this case, that the substituted service proposed will afford the same essential transportation service, but at less convenience to the prospective passengers and shippers. This conclusion is supported by the principles applied in

the following cases from other jurisdictions: *In re Thomson*, 141 Neb. 697, 4 N. W. (2d) 756; *Illinois Cent. R. Co.* v. *Illinois Commerce Comm.*, 397 Ill. 387, 74 N. E. (2d) 526; *St. Louis-San Francisco Ry. Co.* v. *State*, 195 Okla. 41, 155 P. (2d) 718; and *In re Application of Union Pac. R. Co.*, 64 Idaho 529, 134 P. (2d) 599.

In 1942 appellant filed an application with the Corporation Commission to close Carson as an agency station. This was denied. Appellant again, in 1947, filed a similar application, which was likewise denied. Application in the instant case was filed in 1949, some eighteen months after dismissal of the case in 1947. While the Commission denied the present application on the merits, it also held that the order entered by it in 1947 was *res adjudicata*.

The Corporation Commission is clothed by the Constitution with legislative, judicial and executive powers. However, as Mr. Justice Holmes said in *Springer* v. *Philippine Islands*, 277 U. S. 189, 48 S. Ct. 480, 72 L. ed. 845, "We do not and cannot now carry out the distinction between legislative and executive action with mathematical precision and divide the branches into watertight compartments, were it ever so desirable to do so, which I am far from believing that it is, or that the Constitution requires."

Much of the argument in the briefs on this point is directed to the question, whether the Corporation Commission, in considering the application, was acting in its judicial, or in its legislative capacity. Appellant contends that the Commission was acting in its legislative and not its judicial capacity. We do not deem it necessary to decide this question.

This Court, speaking through Chief Justice Prentis, in *Chesapeake, etc., Tel. Co.* v. *Commonwealth,* 147 Va. 43, 88, 136 S. E. 575, 588, on the question of whether or not rates fixed by the Corporation Commission for a telephone company were confiscatory, said: "There is nothing irrevocable, however, about such a conclusion, for such rates are never permanently fixed, but are always subject to

revision. If after a fair trial they prove to be inadequate or unjust, the question can be again reopened before the Commission without difficulty."

The Commission itself properly construed this language in its opinion in this case, as it said: "We construe that statement to mean, not that the question could be reopened by a new petition filed the week after the mandate came down from the Supreme Court of Appeals, but that a new petition could be filed if business got worse." See *Aetna Ins. Co.* v. *Commonwealth*, 160 Va. 698, at p. 726, 169 S. E. 859.

While all the evidence introduced in support of the former application is not before us, a comparison of that which appears in the record with that introduced in this case, shows that in the present case some new and substantial evidence was introduced in support of appellant's contention. The facts now before us, and on which we base our conclusion, are that 76% of the shipments to this station were consigned to one person; that a change in the method of handling freight would create some inconvenience to this shipper, but this inconvenience was out of proportion to the loss the carrier would sustain if compelled to maintain Carson as an agency station; that the loss to appellant was steadily increasing from year to year, and that the loss for the year ending February, 1949, had increased 168% over the amount of loss for the year ending April 30, 1947. This evidence proves, in the words of the Commission, that appellant's business at this station "got worse." Under these circumstances, we do not think that the doctrine of *res adjudicata* applies.

The order of the Commission is reversed and the case remanded.

*Reversed and remanded.*