IN RE APPLICATION OF MISSOURI PACIFIC RAILROAD
COMPANY.   MISSOURI PACIFIC RAILROAD COMPANY,
APPELLANT, V. ZIMMERMAN FEED YARDS ET AL., APPELLEES.
126 N. W. 2d 679

Filed March 6, 1964.   No. 35506.

Kennedy, Holland, DeLacy & Svoboda, for appellant.

Crossman, Barton & Norris, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This is an appeal by the Missouri Pacific Railroad Company, appellant, from an order of the Nebraska State Railway Commission denying appellant the authority to close its station at Springfield, Nebraska, and discontinue its agent there, and from an order refusing to grant a rehearing thereof.

The appellant will be designated as such or as the applicant, the protestants as such when they are referred to together, and the Nebraska State Railway Commission as the Commission.

The appellant contends, among other things, that the Commission's order is contrary to the law and the evidence and is unreasonable, unjust, arbitrary, and capricious.

We sustain these assignments of error.

The applicant operates a branch line from Omaha, Nebraska, to Otoe in Cass County, Nebraska, which passes through Springfield. The service is daily except in the winter months when it is triweekly, Monday, Wednesday. and Friday southbound, and Tuesday, Thursday, and Saturday northbound. Appellant has maintained a full-time agent 8 hours a day, 5 days a week. The agent is paid approximately $20 a day. Appellant maintains a telephone and wire service there. By rail Omaha is 22 miles northward and Louisville 6 miles to the south. Paved highways extend from Springfield to both places.

By highway it is 19 miles to Omaha and 6 miles to Louisville. Half the distance to Omaha is by interstate. There is no passenger service involved at Springfield and the mail is handled by Star Route. The Interstate Commerce Commission has made an order forbidding less than carload shipments of under six thousand pounds to or from Springfield in interstate commerce.

Springfield has a population of 510 by the census of 1960. It appears to have grown somewhat and the protestants who appeared in opposition to the granting of the application claim its present population is somewhere between six hundred and seven hundred. It has service by truck, including that of a local concern, Springfield Transfer. The general nature of the business of the community in the area is agricultural, cattle feeding, and related occupations. It has two feedyards handling cattle, an elevator, bank, general store, post office, hardware store, and feed store.

The basis of the application of the appellant was that the agent and station at Springfield were not justified by the business handled and were maintained as a loss to the applicant. The applicant contended this was shown by exhibits 1, 2, 3, and 4, which its chief statistician in revenue accounting, one E. F. Rau, identified and testified with respect to their preparation.

Exhibit 1 shows the revenue attributed to the station. It is all freight and there is no revenue from passenger service or milk, cream, or egg shipments. The total revenue of the station was $20,982.59 for 1961; $16,995.01 for 1960; $18,351.21 for 1959; $77,406.33 for 1958; and $16,197.02 for 1957. The revenue for the first 3 months of 1962 was $2,813.69. The larger income in the year 1958 arose from the shipment of 420 cars of cement during the construction of highway No. 50, which the testimony shows was abnormal and nonrecurring. Cement shipped in other years was in 1959, 7 cars; 1960, 9 cars; and in 1961, 4 cars. The less than carload shipments sent out from Springfield were 10 in 1957; 6 in 1958; 9

in 1959; 2 in 1960; 5 in 1961; and 1 in the first 3 months of 1962. These will be designated hereafter as L.C.L. shipments as they were termed in the evidence. There were 220 of L.C.L. shipments received in the 5 years and 3 months, or a little less than 4 such shipments a month.

Exhibit 2 gave the carload shipments forwarded and received. Aside from cement, by far the largest receipts in carload lots were cattle which showed a steady decline from 166 cars in 1957, to 25 cars in 1961, and 7 in the first 3 months of 1962. The cement and cattle represented 80 percent of the carload shipments received over the whole period. The total receipts by carloads showed a steady decline except for the cement in 1958. The outbound carload shipments were largely grain, the principal items being corn and wheat. There was a considerable variance in those shipments which the evidence shows depended upon the times in which corn held by the federal government was shipped. There were 448 cars in all shipped between January 1, 1957, and April 1, 1962.

Exhibit 3 disclosed the actual expenses paid out for hiring the agent and station supplies. They were given by years. There was no great difference in them but there is a small, constant increase each year, that of the first year 1957 being $5,166.98, and the last year 1961, $6,050.78.

Exhibit 4 shows by means of a formula the expense to the applicant arising outside of the station attributable to that business. The steps by which this was shown are here set out. First, the receipts of operating freight revenue for the whole railroad system were shown for each of the years 1957 to 1961. Next shown was the total expense of the freight operation for the same years after the expense of maintaining the stations thereon was deducted. From this year by year computation was determined the percentage of each dollar of freight income that was paid out in operational expense

exclusive of the expense of maintaining the various stations. This ratio of freight revenue to expense was then applied to the receipts allocated to the Springfield station for each full year. The percentage ratio of expense to the applicant per dollar received by it and the amount allocated to the total receipts of the station involved were 71.97 percent or $11,657 in 1957; 71.92 percent, or $55,670 in 1958; 73.27 percent or $13,446 in 1959; 74.02 percent or $12,580 in 1960; and 76.10 percent or $15,968 in 1961. Combining the actual expense at the station with the applicant's outside expense determined by this formula and deducting this total from the receipts at the station showed a net loss in maintaining the station for the year 1957 of $627; for 1959 of $806; for 1960 of $1,535; and for 1961 of $1,036. It however showed a profit of $16,194 for the year 1958 when the 420 cars of cement were received.

The formula by which the expense of freight operations outside Springfield were apportioned to this particular station was shown by the evidence to be the method accepted and approved by the Interstate Commerce Commission and the States of Arkansas, Oklahoma, Colorado, and Kansas. The witness Rau testified that it was a fair basis on which to determine the cost of operation. Further testimony concerning shipments for the full first 10 months of 1962, not shown on the exhibits, showed that those carload shipments in and out of the Springfield station were 177 cars as compared with 176 cars in the like period in 1961. The witness Rau testified that in his opinion on the basis of these figures and applying the same formula, the year 1962 would show a net loss in the operations of this station also.

Edwin Long, the district superintendent of stations and claim provisions of the appellant for the district, including Springfield, testified that he had made a study of that station, its records, and the business handled. He had also personally investigated the functions and

duties of the agent there. He testified it would take the agent approximately 10 minutes to handle either a carload or L.C.L shipment. The total of both such items handled in 1961 was 256, or approximately one every working day. There were other duties such as cleaning the station and making monthly reports. These reports are cumulative in character, allowing them to be made a portion at a time. Adding the time attributed to the reports and care of the station he estimated it would take the agent on an average 1 hour and 20 minutes a day to do the complete work involved. On recourse to the tables of other years shown by the exhibits it would appear that the time involved would be approximately the same except as to the year 1958. The agent is paid $20 a day for this service.

The appellant proposes to close its station, including telephone and telegraph service. The business of Springfield will be handled by the agency at Omaha, Nebraska. The applicant has offered to accept at its expense all telephone calls pertaining to railroad business at either Omaha or Louisville, 6 miles away. When a consignor anticipates the need of a car he can call the agent at Omaha and so inform him. The yardmaster at Omaha will be notified and he will see that the car is placed on the train and set out at Springfield. The conductor on the train will spot the car. Consignor will give to the agent on making a phone call the information for the bill of lading. The bill of lading would be executed at Omaha and the train conductor informed at Louisville or some other similar station to pick up the car.

With respect to inbound shipments the consignee would be notified before arrival and could on occasion be notified after arrival by telephone or postal service whichever is necessary at the time. When necessary to trace a car, a call could be made to the Omaha agent who would through the sales department have the proper

clerks trace the shipment and give back the information to the consignee or consignor.

Inbound L.C.L. shipments would be placed in the applicant's station or a suitable container provided and there held at the consignee's risk. Outbound L.C.L. shipments would be handled as carload shipments except no interstate L.C.L. shipments under six thousand pounds would be received. Such interstate shipments must be loaded by consignor and unloaded by the consignee, under the order of the Interstate Commerce Commission which was procured on request of the appellant. Several stations now have this regulation. On inbound cattle shipments the consignee will continue to weigh his shipment as previously. Applicant will accept consignee's statement in regard to cripples. The conductor will handle spotting of cars. Applicant from its experience does not anticipate loss of revenue from the proposed closing. If telephone service with Omaha is interrupted the customer may call or contact the agent at Louisville who is only 6 miles distant.

Those of the protestants who joined in the formal protests filed in the proceeding were quite numerous. However, most of them did not appear to testify. The evidence received on their behalf includes that of James P. Latham, a member of each of three partnerships, all of which were protestants: The Zimmerman Feed Yards; the Latham Lumber Company; and Latham Elevator Company. Latham was connected in some undisclosed way with Ragan and Thomas who were also shippers. He testified that these organizations constituted practically all the business of the station; and that the proposed change would work a hardship on these organizations. At present those connected with them could contact the agent who would make out the bills of lading at Springfield. Telephone service was not the best and sometimes they had to make calls repeatedly to make long distance connections, taking at times 30 or 40 minutes. Placing calls to Omaha therefore would not

be satisfactory. Sometimes it was necessary to wait at his office for replies by telephone. At present the agent would keep track of trains for them. The witness stated that grain cars sometimes are defective and would not hold grain; that the agent trades cars for them; and that if the cars are not delivered promptly his employees stand around waiting and causing expense. The agent could assist in forwarding and processing claims for losses. While admitting there is not more than one carload a day to be handled and L.C.L. shipments are insignificant, he thought the agent should remain to handle them. Latham felt that though the agent works but a short period each day, her expense to the applicant is justified; and that many cattle which were brought to Omaha by rail were brought to Springfield by truck because the shippers could not afford to stand the shrinkage which occurred at Omaha if they waited for a train. He stated the appellant did not consider the time its agent took in driving up to his home to get waybills signed and the extra time in spotting cars at noon hours and evenings when they loaded corn late.

A witness Leo Timmerman, also a feeder, who had just started business in a new yard near Springfield in April 1962, testified. He had however moved some cattle there. He testified about troubles he had had with the applicant and another carrier at a prior location which required his sending trucks for cattle because he could not stand the shrinkage caused by delays while waiting for a train. On occasion the agent at Springfield had assisted in weighing cattle and had informed him the train was late. The agent could be of great assistance in such matters in the future. He was sure that his new yard would develop a great deal of business. Figures testified to by him, and later supplied, showed shipments of cattle but some were over other railroads and in years prior to opening his yard at Springfield.

Protestant Quinten Mahlock, a real estate dealer residing in Omaha, had bought 390 acres of land near

Springfield and has platted a large tract. He testified that there will be in the future many residences built thereon. Thirteen have been built so far of which 10 were occupied. Some residents are commuters who were working in Omaha and at Western Electric; another works at Council Bluffs; and others work at Springfield. Mahlock further testified that parks and business areas were platted also.

Other witnesses representing the local American Legion Club and the Springfield Boosters, the village trustees, and other citizens, including the president of the bank, testified concerning their hope and expectancy of growth in the village and of efforts to attract new business there. They admitted however that they had been unable so far to attract new enterprises.

The commander of the American Legion said they needed the railroad there for the good of the people to come in the future and that the applicant should help share that responsibility.

The district chairman of the Order of Railroad Telegraphers at Omaha testified that the station agent, a telegrapher herself, should be retained at Springfield. It was the witness' present duty to transmit by telegraph the list of all cars in the train to the agent and to inform her of the time the train is called and the time it departs; and that to remove the agent to some other station not covered by the rule of the telegraphers is in violation of the rule of the organization. He felt the agent should be retained for the 8 hours regardless of the time that it took her to do the work.

This is the substance of the evidence in the case. The applicable law in such instances has been laid down in the previous decisions of this court.

In the case of In re Application of Union P. R. R. Co., 149 Neb. 575, 31 N. W. 2d 552, this court said: "The prime object and real purpose of Nebraska State Railway Commission control is to secure adequate sustained service for the public at minimum cost and to protect and

conserve investments already made for that purpose, and in doing so primary consideration must be given to the public rather than to individuals.

"The services and facilities to be furnished by a railroad company at any station need only be just, reasonable, and adequate to the requirements of the station, and should in a measure be commensurate with the patronage and receipts from that portion of the public to whom such service is rendered. Whether or not such company may discontinue its agency service at any of its stations depends upon the facts and circumstances of the particular case.

"The matter of time necessary to be devoted to the performance of duties by an agent of a railroad is a matter of importance in determining whether or not the railway commission acted arbitrarily and unreasonably in denying an application for the discontinuance of an agency.

"The ruling of the railway commission or of this court on the question of discontinuance of an agency at any given time does not amount to an adjudication for the future. It is only a judgment on the condition presented by the application and relates only to the time and conditions presented."

In Chicago, B. & Q. R. R. Co. v. Keifer, 160 Neb. 168, 69 N. W. 2d 541, it was said: "The services and facilities to be furnished by a railroad company at any station need only be just, reasonable, and adequate to the requirements of the station, and should in a measure be commensurate with the patronage and receipts from that portion of the public to whom such service is rendered.

"It is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed or used by the public to any substantial extent.

"On appeal to the Supreme Court from an order of the Nebraska State Railway Commission, while acting within its jurisdiction, the question for determination

is the sufficiency of the evidence to prove that the order is not unreasonable or arbitrary."

In the cause before us the record establishes that with the exception of the year 1958, the station at Springfield has been maintained at a loss. This is not refuted by the protestants. Though there is a tendency at times to be critical of the evidence proffered by the applicant, the protestants do not appear to claim that the station at Springfield operated profitably except in 1958. There is no evidence tending to refute that this year's business was nonrecurring as testified to by the applicant's witness. It is claimed that this one-year's profit should have been spread over the full period involved in the evidence and the losses of other years absorbed thereby. If such were true any profitable business hitherto enjoyed at the station would be lost to the appellant eventually. Moreover, the time of the hearing before the Commission was more than 3 years thereafter. That is the time which should have determined the issues before the Commission.

The principal contention of the protestants is not that the present service is profitable but they hope that their community will grow and that the station will become self-sustaining or profitable. They contend that until then it should be maintained to benefit those who come in the future. Again we must hold that the cause at hand deals with the present. It is common knowledge that most small towns are growing smaller instead of larger. It is also common knowledge that highway transportation facilities are making the delivery of freight by truck much more convenient. Such service is available here. A new highway going through Springfield appears to have been paved recently. Paved roads run to Omaha and Louisville. The latter is only 6 miles distant.

Unquestionably the present service to Springfield is more convenient than that which is proposed, particularly to a very few shippers. However, as said in Thom-

son v. Nebraska State Railway Commission, 141 Neb. 697, 4 N. W. 2d 756: " 'It is not reasonable to require the maintenance of a full-time agency station when the cost of such service is out of proportion to the revenue derived from that portion of the * * * public benefited thereby, especially where a substitute service may be provided which will afford the same essential service but is less convenient.' "

Protestants contend that there will be no saving to the applicant because the agent now employed at Springfield will have a right to obtain employment elsewhere. It is however clear that there will be one less employee for the whole system and that her going elsewhere will relieve other employees and will make one less upon the payroll.

We conclude on reviewing the entire record that continuance of the station and its agent in Springfield is not justified by the business there handled. The duty of regulatory bodies is to keep the business of the railroads it regulates in a sound condition so they can provide adequate service to the public which needs and can support it.

The elimination of the station and its agent will be some incovenience to the patrons at Springfield but the loss of revenue to the carrier does not justify their continuance and the inconvenience involved appears not to be great.

The action of the Commission in refusing to grant the applicant authority to close its station and discontinue its agent was in view of the evidence unreasonable, arbitrary, and unjust, and its action must be reversed.

REVERSED.