COLORADO RIVER WESTERN RAILWAY et al., Appellants,

v.

TEXAS and NEW ORLEANS RAILROAD COMPANY, Appellee.

No. 10333.

Court of Civil Appeals of Texas. Austin.

Oct. 26, 1955.

Rehearing Denied Nov. 16, 1955.

Callaway, Reed, Kidwell & Brooks, O. D. Montgomery, Dallas, for appellant Colorado River Western Ry.

John Ben Shepperd, Atty. Gen., Mert Starnes, Asst. Atty. Gen., Austin, for appellant Railroad Commission of Texas.

Tom M. Davis, Baker, Botts, Andrews & Shepherd, Houston, McKay & Avery, Austin, for appellee.

HUGHES, Justice.

This dispute is between the Colorado River Western Railway (CRW), appellant, and Texas and New Orleans Railroad Company (TNO), appellee, and involves the application or nonapplication of certain rates and charges as between themselves and which directly affect a nonparty shipper of sand and gravel, the Texas Construction Material Company (TCM).

The Railroad Commission of Texas and its members are also parties and appellants.

TNO operates in Texas and in other States and has extensive lines. CRW operates only in Texas and its single line, construction of which was completed in the fall of 1953, is just 9.03 miles long. It connects with TNO at Altair, Texas. It has no direct connections with any other railroad.

On October 14, 1953, CRW filed Circular 500 with the Commission in which it fixed the switching limits of the road so as to include *all* its line and *all* of its operations.[1]

The validity of this ex parte action on the part of CRW is the principal question presented by this appeal. If the action is valid then the rates and charges contended for by CRW are to be applied unless their application would result in an unconstitutional deprivation of the property of TNO.

If the unilateral action of CRW is invalid then rates and charges established by the Commission under the circumstances which would then exist are the proper rates and charges to be applied.

The Commission, for the reasons stated in its Order and set out in footnote 1, refused to set aside such action of CRW. The trial court, however concluded that

1. The view of the Commission as to this action is found in its Order denying TNO's complaint about the matter from which Order we quote:

"Heretofore the Commission has not disagreed with the position taken by some of the railroads that the matter of switching limits is one to be determined by the individual railroads, since, among other things, it affects the operations of their line haul trains as compared with switch engines, and the respective crews. As far as we are now aware, there is nothing to prohibit CRW from fixing its switching limits at Altair so as to include all of its trackage. This CRW has elected to do, and until changed by CRW, or until it might be concluded that it is a duty of the Commission rather than of the railroads to fix switching limits, we are of opinion and find that in these proceedings we must treat with the service of CRW as that of terminal switching, as to shipments moving beyond Altair. Were the switching limits of CRW at Altair not such as to include the location of the sand and gravel pit and the movements therefrom over CRW were in line haul service, we would conclude that CRW is entitled to a division of the line haul revenue. Such is not the condition at this time, hence there is no need for our undertaking to determine and state what would be a proper basis for division of line haul revenue. So long as CRW's service is limited to switching we do not consider that we could require a division of line haul revenue to accrue to CRW. Further, the location of the sand and gravel pit at Altair having been and now being within the switching limits of Altair, we cannot conclude that we could require assessment of joint line rates on shipments which have moved, out of which CRW would receive a division."

"CRW had no legal right to declare its entire line of railroad to be within the switching limits of Altair, there being no reasonable necessity for such action, as considered from the standpoint of the justiciable (justifiable) operating needs of CRW, or the lawful interests of the shipping and receiving public, and the effect thereof upon the rights of the connecting line, T&NO."

and entered judgment decreeing such action null and void and enjoining the application of any rates or charges based thereon.

■ We agree with the trial court that the action of CRW in the premises was unreasonable, arbitrary and void insofar as it injuriously affects TNO.

■ The record in this case is very large, the statement of facts containing 1475 pages not including a large volume of exhibits. The trial court has condensed this huge record into full yet concise findings of fact. In the absence of any proper objections [2] to such findings we accept and adopt them as our own insofar as they are necessary to sustain our judgment herein.

We take the following pertinent facts from the findings made by the trial court:

TNO is, and for many years has been, duly incorporated and existing as a common carrier railroad, owning and operating extensive lines of railroad within the States of Texas and Louisiana, including lines within Colorado County, Texas, where it serves the towns and stations of Altair, Jayray, Laban, Eagle Lake, Columbus and others. The sand and gravel company, TCM, is, and for a number of years has been, engaged in the business of producing sand and gravel from various deposits in Colorado County, Texas, and elsewhere, and selling the same in various markets, principally in the Houston metropolitan and Southeast Texas trade area. In the con-

duct of its business, TCM had acquired extensive sand and gravel pits in Colorado County, and about the year 1950 acquired a lease upon extensive deposits located upon the west side of the Colorado River, about eight and one half or nine miles northwest of Altair, and about two miles south of Alleyton, in Colorado County. In addition, TCM owns or operates sand and gravel pits in the vicinity of, and ships sand and gravel from, Eagle Lake and Alleyton, and formerly shipped from Hollimon and Columbus, all in Colorado County, Texas.

Following acquisition of the sand and gravel leases mentioned the officers and the management of TCM proposed that either TNO build a railroad to serve the territory or that they would cause a common carrier railroad to be built. TNO advised TCM it would not construct such rail facilities.

Thereafter, August 6, 1952, CRW was incorporated, its charter providing:

"The corporation is formed for the purpose of constructing, owning, maintaining, and operating a railroad under the provisions of Title 112 of the Revised Civil Statutes of Texas, as amended [Vernon's Ann.Civ.St. art. 6259 et seq.].

"The railroad will be constructed from Altair, Colorado County, Texas, to Helms, Colorado County, Texas, and the entire construction will be within Colorado County, Texas. Helms is the designation of the end of the contemplated line of railroad and is approximately 8.5 miles northwest of Altair and approximately 2 miles south of Alleyton, Colorado County, Texas. The railroad, when constructed, will have approximately 9.81 miles of operating track."

Subsequent to incorporation of CRW its officers represented to TNO and its officers that CRW proposed that it would

---

**2.** Neither appellant attacked any finding of fact in their original but separate briefs. In an amended and reply brief CRW assigned numerous errors, in an appendix, to the lack or insufficiency of the evidence but inasmuch as such points are not briefed they are waived and we have given no consideration to them.

charge and joint-line rates would be paid on shipments made by TCM, and thereafter, TNO and CRW on January 26, 1953, entered into a track connection and interchange agreement for the handling of traffic at the connecting point of Altair, Texas. In making said contract, TNO relied upon the aforesaid representations made by CRW.

The general basis of rates on rail movement of sand and gravel (carloads) are mileage scale rates, and the level of these rates between two given points, when the line haul is entirely by one rail line (single line rate) is lower than the level of applicable rates when the line haul is by two or more rail lines (joint-line rate). In other words, single line rates are at a lower level than joint-line rates for the same mileage. As pertinent to this controversy, and by illustration, the single line rate from Altair to Houston (rail distance of 72.8 miles) is lower than the joint-line rates from Helms to Houston (figured on a rail distance of 72.8 miles plus 8.5 miles, or 81.3 miles) for two reasons, viz., the distance is greater and the rate is a joint-line, rather than a single line rate. These mileage scales of rates on sand and gravel were promulgated by the Commission prior to the incorporation of CRW and have been in existence at all times material hereto.

In the year 1953, and prior to the time that CRW commenced operations, TNO, through its officers, conducted good faith negotiations with CRW and its officers for the purpose of arriving at an agreement between the two lines for the division of the applicable rates covering movement of TCM sand and gravel from the station of Helms, via Altair, to destination at rail points in Texas. In this regard, TNO offered CRW a division of 30 cents per ton, for its portion of the interline haul covering the initial movement, Helms to Altair, which, on an assumed loading of 55 tons per car, would gross CRW the sum of $16.-50 per car, and TNO requested CRW to furnish any operating information available to the latter which in its opinion might justify a greater division. CRW wholly failed to furnish TNO any estimate of operating expenses, cost or other data show-

ing either CRW's revenue needs or that the offered division of 30¢ per ton would not enable it to operate at a reasonable profit.

Subsequent to September 21, 1953, and without notifying TNO that negotiations for a division of rates were broken off, and without asking the Commission to fix a fair division, CRW took the following action:

(a) On September 30, 1953, applied to the Commission for authority to apply at its station of Altair a terminal switching charge of $11.27 per car. Under the Commission's general orders, such amount would be absorbed by TNO from its line haul transportation revenue.

(b) On October 14, 1953, issued its Tariff Circular No. 500, (purporting to be effective October 16, 1953, and purporting to place its entire line of railroad 9.05 miles in length) within the "switching limits" of its station of Altair, and purporting to fix a switching charge covering movement of loaded cars from approximately the end of its line of railroad to Altair, of $5.63 per car, when Ex Parte 175 rate increases are added, purport to make a terminal switching charge of $6.47 per car (to be increased to $11.27 as above). Under the Commission's general orders, this amount must also be absorbed by TNO from its line haul revenue.

(c) CRW asserted and maintained that by reason of the foregoing action and the Commission's Railroad Freight Circular No. 20373, train movements of sand and gravel from the connection between TCM's plant tracks and CRW near Helms to Altair, which shipments thereafter moved to Altair for further movement thereafter by TNO, were mere switching movements; and that on such movements the line haul transportation did not commence at Helms but at Altair; and on such movements the mileage rates determining the line haul rates should be computed from Altair rather than from Helms.

The motive, purpose and intent of declaring the entire line of railroad within the switching limits of Altair, and to seek application of a switching charge for the common carrier service from Helms to Altair was to avoid application of the applicable joint-line mileage scale of rates, with mileage computed from Helms, on shipments moving through Altair, on the TNO; to impose the cost of such transportation to Altair on TNO through requiring it to absorb the so-called switching charge out of its line haul revenue from Altair; and to permit such TCM shipments to enjoy single line rates with mileage computed from Altair (rather than from Helms) on shipments moving to TNO destinations.

Considering the matter of station switching limits in general, it is neither usual nor customary for any railroad, whether a short line, such as CRW, or a trunk line, such as TNO, to fix or attempt to fix the switching limits of a small station, comparable to Altair, so that said limits would extend as proposed by CRW in this case. TNO's switching limits generally extend only one mile in each direction from its station or station board at unincorporated towns such as Altair. With reference to larger towns and cities served by TNO, including those with large population and considerable industrial development, in practically every instance the switching limits are substantially less than nine miles in length in any one direction. The evidence fails to show any situation existing either on TNO or any other line of railroad, where the switching limits at a small town, such as Altair, extends in any direction as much as nine miles, counting both the trackage of trunk line railroad and any industry tracks connected therewith.

The town of Altair, which is a station on TNO and on the main line and southern terminus of CRW, is a small, unincorporated village with a population of approximately 75.

The CRW track connections with TNO, as well as the CRW delivery, receiving and weighing tracks, are all located within a radius of less than a mile of the TNO and CRW stations of Altair. More specifically, the CRW auxiliary tracks mentioned are within the immediate vicinity of the physical track connections of CRW with TNO, the most northerly of these tracks being the weighing tracks, located on the CRW main line at mile post 0.3 from Altair.

From Altair the CRW railroad extends for a total distance of about 9 miles in a northwesterly direction, passing through rural, grazing, farming or ranching lands, across several public highways, and terminates west of the Colorado River at a point where CRW connects with the TCM plant tracks.

Prior to the controversy made the basis of this suit, CRW duly and publicly designated, opened and established two stations on its line of railroad, viz:, a station at Altair, and a station at Helms, Texas, a point on its main line 8.5 miles north of Altair, although no building or sign post was erected at the station of Helms.

The CRW running north out of Altair consists of a single track, its main line, which, between mile posts 0.3 and 8.3 north of Altair, has no siding, passing, spur or other type of switching track or track facilities which would permit switching operations along this portion of the CRW main line north of Altair.

Between CRW mile post 8.3 and the end of its line at approximately mile post 9.05, CRW has a passing track, spur track and connections with the plant tracks of TCM, which area between mile post 8.3 and mile post 9.05 is the only area on the CRW north of its mile post 0.3 within which switching operations could be performed by such railroad.

The CRW station of Helms is located, established and exists at a point on the CRW main line at mile post 8.5, which point is between the points designated as mile post 8.3 and mile post 9.05 at the end of the line. The station of Helms has never been abolished, removed, or its location changed by CRW, nor has the Railroad Commission of Texas had any proceeding

or application before it for either of these purposes.

At Helms, and in the near vicinity thereof (i. e., within a CRW track distance of one half mile on the north, and within a lesser track distance on the south), the CRW regularly stations its engine and cars, handles loaded and empty gondola cars, makes up its train southbound for Altair, and breaks up its northbound train. It is the regular and usual point of origin for all traffic tendered CRW by TCM, and place where it receives traffic from TCM for movement on its lines.

Sand and gravel received from TCM by CRW at its northern terminus in the vicinity of Helms is transported by CRW from Helms to Altair in a continuous operation, and in train or line haul transportation movements as distinguished from switching movements. Said cars are stopped for weighing at the scale track prior to placement on the interchange track.

As regards the train movements performed by CRW in the handling of loaded cars of sand and gravel tendered it at Helms and vicinity by TCM from the latter's pits near the Colorado River and transported to Altair, said train service in behalf of TCM was and is a line haul service, and was not a switching service, nor a terminal switching service.

Since the inception of CRW all shipments over its line have either originated at or been destined to TCM plants.

In Texas, no other short line railroad (some having had main lines of only 2 to 7 miles) has ever operated on the basis that its entire line of railroad is within the switching limits of one station on its line.

CRW's terminal at Altair does not extend for the entire length of its line, and physically the Altair terminal of CRW is limited to the area of its delivery and receiving tracks and scale track at Altair.

CRW has not and does not render a "terminal switching service" in handling loaded cars originating at its northern terminus and moving to Altair. Such movements constitute line haul transportation from one terminus to another over entire line of CRW.

No reasonable necessity exists, whether considered from the standpoint of the legitimate business interests of CRW or of the shipping and receiving public, for CRW's placing its entire line within the switching limits of its station of Altair.

At origin or destination points, it is frequently necessary for a railroad, other than the line haul carrier, to perform a terminal switching service. In railroad parlance, the terms "terminal switching service" and "reciprocal switching service" mean the same thing and are used interchangeably.

The Commission has prescribed charges for terminal switching service and requires that this charge be absorbed out of the line haul revenue by the carrier performing the line haul transportation except when said line haul revenue falls below a certain amount.

At every point on the line of TNO in Texas where it is required to absorb a switching charge of another railroad, (except terminal switching companies incorporated as such at large industrial centers) said railroads whose switching charge TNO absorbs likewise absorbs switching charges covering terminal switching service rendered by TNO at the same point.

If CRW were permitted to include its entire line of railroad within the switching limit of its station at Altair, this would be the only point where TNO would be required to absorb a charge for terminal switching service of a company not incorporated as a terminal company, where said company did not likewise absorb a charge for a terminal switching service performed by TNO at the same point.

To the extent shown by the evidence, it appears that where absorption of switching charges is made between common carrier railroads, reciprocity generally exists (terminal companies at large cities excepted).

So long as CRW retains its entire line within the switching limits of its station at

Altair, there is no possibility that CRW could or would have to absorb any terminal switching charge for services rendered by TNO, and accordingly, there is not and cannot be any reciprocity as between TNO and CRW, although both operate under authority of Title 112 of the Revised Civil Statutes of Texas, and CRW is not incorporated to operate as a terminal railway.

To require TNO to accept loaded cars from CRW at Altair which have moved from Helms and to absorb CRW's alleged switching charge instead of applying a line haul transportation charge thereto, obligates TNO to interchange such freight on different terms and conditions with CRW than apply with reference to TNO's interchange of freight with connecting railroads at other Texas points under comparable conditions.

If CRW were permitted to place its entire line within the switching limits of its station of Altair, such act would result in a preference and advantage to TCM and a prejudice to TNO.

The performance by CRW of a line haul service in the guise of a switching service at no cost to TCM is a rebate.

To compel TNO to absorb the alleged switching charge of CRW covering movement from Helms to Altair is in effect a rebate by TNO to TCM.

Under the General Rules of the Commission in effect long prior to this controversy, a carrier is required to perform switching service in its terminal area on any shipments tendered to it for transportation. Under such rules no charge is allowed or permitted if the carrier performing the switching service either has or will perform a prior or subsequent line haul movement on such shipment. If the switching service is performed by a carrier which has not or will not perform prior or subsequent line haul transportation of such shipment, the General Rules of the Commission require the carrier which has or will perform the line haul transportation to absorb the switching charge of the line performing the switching service.

The effect of this rule as CRW seeks to apply it here through the device of establishing its entire line as a switching operation only is that it will never perform any line haul transportation either before or after it renders switching service and hence it will receive but never be required to absorb any switching charges.

The trial court found that from the time of its incorporation CRW was and is completely controlled and dominated by TCM and in this regard specifically found:

All of the capital stock of CRW (41,000 shares of the par value of $1 per share), except 1700 shares, is owned, held and voted by TCM. Of the 1700 shares not owned by TCM, 700 are owned by officers, directors or employees of both TCM and CRW.

CRW's line of railroad was constructed under contract by TCM and its subcontractors over rights of way leases acquired by TCM and assigned to CRW for a total consideration of $20.

Six of CRW's nine directors have at all times been directors of TCM and CRW has not paid any of its directors anything for serving as such. In addition, each of said six directors has also been an officer, stockholder or employee of TCM.

Of the eight officers named in CRW's charter, all except Sheffield were directors, officers, employees and stockholders of TCM. Sheffield is an accountant with the firm which performs auditing services for TCM. At all times, the majority of the officers have been directors, officers and stockholders of TCM.

None of the officers of CRW, except Flynn and James McCall Smith (who at different times have been employed as assistant general manager) have either received any compensation, directly or indirectly, from CRW and none of them have been given a definite promise of compensation for either past or future service. Flynn and James McCall Smith have never been directors or stockholders of CRW.

CRW, without having an appraisal made, purchased its locomotive from TCM.

From time to time as CRW has needed funds, first for construction and later for operating expenses, the same have been advanced by TCM, and at the time of trial, CRW was indebted in the sum of $521,274.20, $511,121.23 of which was owed to TCM, this being evidenced by two notes for $400,000 and $18,551.62, respectively, and by open account in the amount of $92,568.61. All of said indebtedness is unsecured. The $400,000 note was payable in ten years, but carried a provision authorizing the officers who signed it on behalf of CRW (those also being officers and directors of TCM) to accelerate the maturity at any time and in any manner they considered proper. The value of CRW's assets is less than its total indebtedness.

Although TCM is the only shipper of freight over CRW, it has not paid CRW anything for shipments which have moved over CRW's line to Altair and from there outbound over the line of TNO.

TCM has full, complete and absolute control and direction over the financial status, policies, practices and management of CRW.

Appellant CRW has eleven points of error assigned and briefed in its original brief.

The first, second, third and sixth points relate to the legality, reasonableness and of the effect to be given to the action of CRW in including its entire line within switching limits. We have previously stated our opinion that such action was arbitrary, unreasonable and void.

It is not our intention to prescribe any rule of conduct which would interfere with the internal affairs of CRW or any other corporation except as may be required in order to protect the public or other interested parties from injury. Freedom of action is wholesome only so long as it does not injuriously affect others.

The findings of fact and the undisputed testimony disclose that it is physically impossible for CRW to perform switching

services, as they are commonly understood, anywhere on its line except at either end. There are no facilities and no need for such services between such termini. For CRW to denominate line haul service a switching operation does not make it so. The undisputed evidence proves the misnomer. This would doubtless be of no moment except that CRW, itself, and others are thereby adversely affected.

As to CRW we, perhaps, should not concern ourselves except that its stockholders, considered apart from their connections with TCM, as CRW would have us do, would suffer from diminished revenues of the corporation.

Decision based on this premise alone is not required because our primary concern here is with the complaint of TNO. Briefly the device employed by CRW deprives TNO of the right to charge joint-line rather than lower single line rates on shipments originating with CRW and compels it to pay CRW switching charges which it otherwise would not be required to pay. The loss sustained by TNO enures to the benefit of TCM and in this connection we think it wholly immaterial that TCM does not pay the freight charges. The cost of transportation is necessarily a part of the cost of goods transported and, assuming the goods to be worth their cost, the question of who pays the freight is merely a bookkeeping transaction.

We believe it fundamentally clear that as stated by the United States Supreme Court in Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 1073, 30 L.Ed. 220, as quoted in Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022, 1026:

> " 'Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.' "

and as stated by the same Court in Jones v. Securities & Exchange Commission, 298 U.S. 1, 56 S.Ct. 654, 661, 80 L.Ed. 1015, as quoted in Shell, supra, 161 S.W.2d at page 1026:

"Arbitrary power and the rule of the Constitution cannot both exist. They are antagonistic and incompatible forces; and one or the other must of necessity perish whenever they are brought into conflict. To borrow the words of Mr. Justice Day, "'there is no place in our constitutional system for the exercise of arbitrary power."'"

The act of CRW, under discussion, was, in our opinion, the exercise of arbitrary power, and the act of the Commission in approving, condoning or at least in refusing to set aside such act was erroneous.

CRW's fourth and fifth points are anticipatory of appellee's contention that to require it to absorb the switching charges as ordered by the Commission would result in such low revenues from the business involved so as to unconstitutionally deprive it of its property.

We need not discuss these points since we have held the action of CRW from which these charges arise to be invalid.

■ CRW's seventh point is that the trial court erred in fixing the rates and charges to be assessed on shipments handled by CRW.

There is no factual basis for this point. The court fixed no rates or charges. All rates and charges involved in this case have been established by the Commission. The trial court by its judgment declared the operations of CRW to be a line haul operation subject to "* * * existing line haul rates or at lawful rates hereafter fixed by the Railroad Commission of Texas * * *."

■ CRW's eighth point is that the trial court erred in making the rates and charges fixed by it retroactive.

The trial court ordered that the proper line haul rates established by the Commission should apply to shipments made by CRW over appellee's lines from the commencement of CRW's operations.

This point is overruled upon the authority of Gulf, C. & S. F. Ry. Co. v. American Sugar Refining Co., Tex.Civ.App. Austin, 130 S.W.2d 1030, writ refused. The court there held that rates held to be invalid were invalid from inception and that previously existing legal rates were applicable after the new but illegal rates were promulgated.

■ The ninth point made by CRW is that the trial court erred in striking down a general order of the Commission which was not under attack.

The order referred to is Circular 4300 which requires the absorption of terminal switching charges by a line haul carrier.

No mention of this circular is to be found in the judgment and no language therein can be construed as striking down such circular. The point is overruled.

■ The tenth point made by CRW is that the trial court erred in not sustaining its plea in bar to the right of TNO to maintain this suit.

CRW contends that the directors of TNO are not stockholders as required by Art. 6288, Vernon's Ann.Civ.St., and hence there is no legal board of directors with authority to bring this suit.

It was stipulated that the one share of stock issued to each director were mere "qualifying shares" and that they were not actually owned by such persons but were in fact owned by the Southern Pacific Railway, a foreign corporation.

In order to be a "stockholder" under this statute it is not required that a director own any beneficial interest in the stock. To hold the mere legal title suffices. Hildebrand Texas Corporations, Vol. 3, p. 95.

■ The last point is that the trial court erred in not sustaining CRW's motion for judgment.

. The substance of the motion seems to be that since the switching charges exacted of TNO by CRW are reasonable that the remedy of TNO, if it is suffering, is to persuade the Commission to increase the line haul rates from Altair to destination.

. In our opinion this point is academic and of a purely advisory nature and therefore not such as to call for any discussion on our part. It is overruled.

■ Turning now to the brief of the Commission we find in it no points not in the brief of CRW and that such briefs are consistent in every respect except as to the question of whether or not the Commission has the authority to regulate the establishment of switching limits of a railroad, the Commission contending that it has such authority even though it has never been exercised. Cited in support of its position is Missouri, K. & T. Ry. Co. of Texas v. State, Tex.Civ.App.Austin, 275 S.W. 673, writ refused, where it is said:

"The Railroad Commission of Texas is a constitutional board or tribunal created for the specific purpose of supervising and controlling the operations of railroads within this state. The duty of its members is to become acquainted with and to know the transportation problems and conditions generally as to each railroad. Railroad regulation in every aspect is within its jurisdiction. Sovereignty granted it power to hear and determine all subject-matter of railroad regulation. Its powers are far-reaching and important, and its orders, rules and regulations are subject to review by the courts by the aggrieved party as to their reasonableness and justness."

This, in our opinion, is sound law and applicable to the situation presented here. We believe that the Commission had it exercised the jurisdiction which it possesses would have reached the result reflected in this opinion.

. The judgment of the trial court is affirmed.

Affirmed.