LOWDEN et al. v. STATE.

No. 30156. Oct. 14, 1941.

*118 P. 2d 242.*

W. R. Bleakmore, Robert E. Lee, John Barry, and W. L. Farmer, all of Oklahoma City, for plaintiffs in error.

L. V. Reid, General Counsel for Corporation Commission, and Ed. White and R. Maurice Huff, Assts., for defendant in error.

DAVISON, J. The present appeal is very similar in all material respects to cause No. 30157, entitled Lowden et al. v. State, 189 Okla. 491, 118 P. 2d 238, this day decided.

By the order appealed from herein the Corporation Commission denied appellants' application for the discontinuance of the services of its regular station agent at Optima, Okla.

According to the evidence introduced at the hearing on said application, Optima is a small settlement of no more than 65 or 75 inhabitants. It is a "flag stop" on the appellants' "transcontinen-

tal main line," extending from Kansas City to Tucumcari, N. M., and is a rail distance of 8.9 miles east of Guymon, Okla., and 10.5 miles west of Hooker, Okla. Appellants maintain so-called "open stations" and employ regular full-time agents at both of the latter towns. The business establishments at Optima consist of two grain elevators, a lumber yard, two filling stations, a hardware store, a grocery store and a drugstore. According to testimony on behalf of the appellants, Optima's trade territory extends about halfway to Guymon and halfway to Hooker, though the operator of one of the grain elevators and the lumber yard there testified that these establishments serve a territory extending northwest of Optima as far as 18 miles. There is no other railroad than the appellants' running through Optima, but, according to the testimony, there is a hard-surfaced highway connecting it with both Guymon and Hooker, and paralleling the railroad to Liberal, Kan.; and the community is served by a regularly scheduled truck line every day except Sunday.

The appellants' appeal in this case is based upon the same principal propositions submitted in cause No. 30157, supra. Thus they contend that the order appealed from is unreasonable, and in support of this contention argue that according to the evidence the expense of maintaining a regular station agent at Optima is out of proportion to the revenue derived from the public benefited thereby. Here, as in the other cause, the only definite proof of the amount of revenue received at the Optima station as compared with the expense of maintaining said station was contained in statistics introduced by the appellants covering the period from October 1, 1938, to January 31, 1940. According to the evidence and the findings of the commission, 33 carload shipments of freight were received and forwarded at the Optima station during said period. Upon the hypothesis that all of these carload shipments were revenue producing, the commission computed the railroad company's total revenue from such shipments at $6,737.31, added this to the total revenue said company received from other business handled at said station during the period, and concluded that its total revenue-producing business at the Optima station amounted to a total sum of $7,590.18, as compared with a total expense chargeable to the station of $2,802.67. Upon the basis of these figures, the commission concluded that under the 50 per cent rule, the railroad's net profit from the Optima station for the 16-month period was $1,072.89. Eleven of the 33 carload shipments, which in the commission's findings were considered as having accounted for $4,670.80 of the railway company's total revenue for the period, contained materials and equipment which were used by Morrison-Knudsen Company, Inc., in revising the grade on a portion of the railroad's roadbed. According to appellants' evidence these shipments were handled free of charge to said construction company under its contract with the railway company, and their counsel contend that the commission erred in including them in its calculations. We think this contention is correct. It is unnecessary to decide whether these shipments should have been considered as revenue producing or not. The important consideration is that according to the undisputed testimony such shipments are not recurring and do not comprise a portion of the business handled by the railway company at the Optima station during an average period. Consequently, appellants' statistics with those items included do not furnish a true criterion as to said company's total freight business or total income therefrom during such a period. When these items are excluded from the statistics in question, it will be seen that the railway company handled only 22 carload shipments at Optima during the 16-month period and sustained a net loss on its station there of $1,262.51. Most of these shipments consisted either of cattle or wheat. According to the testimony on behalf of the appellants, all of such shipments can be handled adequately without a station agent at Optima, and there is no positive proof that anyone living in the Op-

tima community or doing business there would be substantially inconvenienced by the discontinuance of such service. The testimony of the witness Paul Wright furnishes the only detailed description in the record of the method used in shipping carloads of wheat from the Optima station. Wright, who operates one of the grain elevators there for the firm of Riffe & Gilmore, claimed it would be inconvenient to obtain bills of lading for wheat shipments from the railway company's station agent at Guymon, but his testimony in support of this claim is rather unconvincing. He admitted that his firm's shipments were made upon bills of lading with drafts attached, and that as there was no bank at Optima, the drafts had to be obtained at Guymon. If this method is the one usually employed in shipping wheat from Optima (and there is no evidence to the contrary), then it appears that a trip to, or communication with, Guymon is a necessary preliminary to such shipments whether a regular station agent is maintained at Optima or not. It seems that if wheat shippers must obtain their drafts at Guymon, there should be little additional inconvenience attached to obtaining bills of lading there also.

Appellants' statistics further reveal that a small portion of the revenue therein tabulated is derived from milk and cream shipments out of the Optima station. According to the undisputed testimony of the railway company's assistant superintendent, the transportation charges on all of such shipments are collected from the consignee, so that with a caretaker at said station to lock them up until picked up by the company's train crews, the absence of a regular agent at Optima would effect no material change in the service rendered by said company on such shipments.

Of the railway company's total revenue from the Optima station for the 16-month period, $542.51 was derived from 289 l. c. l. shipments and $78.80 from excess baggage and passenger tickets. Thus, as pointed out by counsel for the appellants, only one small shipment was handled every 1.69 days and a little more than $1 per day was derived from both of the sources mentioned. In this respect the case is very similar to Lowden et al. v. State, 182 Okla. 549, 78 P. 2d 1059, in which this court held erroneous an order of the Corporation Commission denying the same railroad's application to discontinue the services of its regular station agent at Lima, Okla., where the evidence revealed that an average of only one passenger ticket was sold at said station per day and an average of one small shipment of freight was made there on alternate days. We think that the evidence is entirely insufficient to warrant the railroad's maintenance of a regular agent at the station in question for the handling of these two classes of business at an average cost to it of $5.74 per day. According to the evidence, the substitution of a caretaker for a regular agent at Optima would bring about no essential difference in the service that the railway company furnishes to passengers there, and according to the testimony, most of the less than carload shipments moving in and out of Optima are now handled by trucks.

Another fact shown by the appellants' statistics, which we have not hereinbefore mentioned, is that during the 16-month period between October 1, 1938, and January 31, 1940, the station agent at Optima worked more than 600 hours overtime, for which he was paid more than $500 in addition to the sum he is hereinbefore shown to have received during the period for regular time. The evidence reveals that the agent's work during this overtime consisted of sending or relaying information concerning trains over the railway company's telegraphic wires and could not be properly charged as a part of said company's agency expense at Optima. Counsel for the appellee refer to such evidence as

498

proof that the services of a regular telegraphic agent at Optima is necessary from an operating standpoint, but we do not think it can be so considered in view of the uncontradicted testimony of the railway company's assistant superintendent that there is no reason from an operating standpoint for maintaining such an agent. While we do not think any particular weight should be attached to said official's statement that said agent was allowed to work so much overtime on account of a kindly feeling between him and the company's train dispatcher, yet we believe other portions of the assistant superintendent's testimony sufficiently establish that such work could as adequately and as efficiently be performed in the future by agents at other stations on the company's transcontinental line as by an agent at Optima.

After a thorough examination of all of the evidence, we are convinced that the small additional convenience to the public of the services of a regular station agent at Optima does not justify the relatively great expense that the maintenance of said agent entails. The latter is clearly out of proportion to the revenue the railroad company derives from said station and the benefit to the public from its maintenance of a regular agent there. Consequently, under the principles applied in cause No. 30157, supra, the order appealed from is unreasonable. It is therefore reversed, and the Corporation Commission is directed to proceed in a manner not inconsistent with the views herein expressed.

WELCH, C. J., CORN, V. C. J., and OSBORN, GIBSON, HURST, and ARNOLD, JJ., concur. RILEY and BAYLESS, JJ., absent.