(No. 7076. February 22, 1943.)

IN THE MATTER OF THE APPLICATION OF THE UNION PACIFIC RAILROAD COMPANY, A CORPORATION, APPELLANT, FOR LEAVE TO DISCONTINUE AGENCY AT MONTOUR, IDAHO.[1]

[134 Pac. (2d) 599.]

---

[1]We have revised the title of this case to conform to the requirements of Rule 37 of this court and the decision in Gardner v. Blaine County, 15 Ida. 698, 99 P. 826.

George H. Smith, H. B. Thompson and L. H. Anderson for appellant.

Delana & Delana, for protestants, made no argument and filed no brief.

A. L. Crowley appeared on behalf of the Public Utilities Commission but made no oral argument and filed no brief.

AILSHIE, J.—This is an appeal from an order of the Public Utilities Commission, which order denied the appellant's (Union Pacific Railroad Company) petition to discontinue their regular station agency at Montour, Idaho. The application was originally made and filed December 18, 1940. Hearing was subsequently had and the matter was continued and held in abeyance until such time as additional information could be furnished by the company, showing receipts and disbursements for 1940 and 1941. For convenience, we will hereinafter refer to appellant, Union Pacific Railroad Company, as the Company.

The company operates and controls what is commonly known as the Idaho Northern Branch, extending from the company's main line at Nampa to McCall. This branch line runs through the intermediate points of Emmett, Montour, Horseshoe Bend, Banks, and other points. The company has heretofore continuously maintained a regular agency at Montour with a resident agent who was a telegraph operator and who discharged all the regular and usual duties of a station agent.

It is contended by the company, that its business at Montour has declined and that the community of Montour can be adequately, efficiently, and reasonably served by a *caretaker*, whom the company proposes to substitute for an agent and furnish all the substantial service that is given by a regular agency. The company says that
"a caretaker would be employed to look after and take care of the freight, keep the waiting room warm, care for the cream and express, or any other shipments received at the station for shipment or delivery, and would perform the same service as that performed by the agent except that he would not be required to keep accounts or perform telegraph duties."

It further proposes:

"As to carload shipments, (and for use in transacting

any other business or obtaining information) appellant agreed to maintain a telephone at Montour so that cars can be ordered through appellant's agent at Emmett or Horseshoe Bend and to notify the agent when the cars are ready to move. The shipper would make out the bill of lading for the car (which is the shipper's duty) and leave it with the caretaker or place it in a box provided for that purpose from which it will be picked up by the train conductor and the car moved."

Substitution of similar nonagency service is proposed here for Montour station that was offered by the company in *O. S. L. R. Co. v. Public Utilities Comm.*, 47 Ida. 482, 276 P. 970, wherein the change from an agent to a caretake was approved and allowed by this court.

It appears that Montour and the immediate surrounding community, has about 800 voters; the village has one general store, one garage, a telephone office, one service station, a blacksmith shop, and a school. The adjacent communities of Sweet and Ola have generally been served from Montour and are included within the estimated voting population of the Montour section. The industry of the surrounding country is farming and grazing. The L. C. L. business done at this station, for the first eleven months of the year (1940) in which this application was made, and for the corresponding period in the preceding year (1939), was as follows:

| "LCL received | 1939 | 1940 | | |
|---|---|---|---|---|
| January | 20.16 | 16.45 — | 10 | Shipments |
| February | 21.85 | 160.68 — | 18 | " |
| March | 20.16 | 50.69 — | 18 | " |
| April | 58.92 | 59.71 — | 11 | " |
| May | 207.38 | 17.97 — | 10 | " |
| June | 46.01 | 20.71 — | 8 | " |
| July | 42.26 | 8.87 — | 8 | " |
| August | 269.58 | 48.70 — | 13 | " |
| September | 89.11 | 42.37 — | 15 | " |
| October | 97.56 | 37.10 — | 17 | " |
| November | 26.14 | 40.04 — | 19 | " |
| Totals | $899.13 | $503.29 | 147 | " |

| LCL forwarded | 1939 | 1940 | | |
|---|---|---|---|---|
| January | 3.81 | 1.10 — | 2 | Shipments |
| February | 8.43 | 43.31 — | 2 | " |
| March | 3.81 | none | | |
| April | .50 | none | | |
| May | 2.20 | none | | |
| June | .90 | 5.66 — | 2 | " |
| July | 1.00 | none | | |
| August | none | 2.88 — | 2 | " |
| September | 3.70 | 1.49 — | 1 | " |
| October | 3.10 | none | | |
| November | .55 | 5.89 — | 1 | " |
| Totals | $28.00 | $60.33 | 10 | " " |

The C.L. business forwarded and received for the same period was:

| "C.L. Received | 1939 | 1940 |
|---|---|---|
| January | none | none |
| February | $194.97 | $159.60 |
| March | none | none |
| April | 650.58 | 920.95 |
| May | 788.55 | 540.77 |
| June | 188.65 | 232.66 |
| July | 64.13 | 536.27 |
| August | none | none |
| September | none | 191.29 |
| October | 63.75 | 1234.91 |
| November | 347.61 | none |
| Totals | $2298.24 | $3816.45 |

| C.L. Forwarded | 1939 | 1940 |
|---|---|---|
| January | $3571.63 | $ 61.06 |
| February | none | 126.12 |
| March | 113.90 | 227.80 |
| April | 834.39 | 114.40 |
| May | 478.53 | 988.53 |
| June | 621.96 | 405.45 |
| July | 427.95 | 777.65 |
| August | 378.36 | 764.03 |
| September | 1651.96 | 845.92 |

| | | |
|---|---|---|
| October | 1160.00 | 112.80 |
| November | none | 147.70 |
| Totals | $9238.68 | $4571.46" |

A summary of the business and expense for the first eleven months of 1939 and the like period in 1940 shows the following:

| | "1939 | 1940 |
|---|---|---|
| L.C.L. Received | 899.13 | 503.29 |
| L.C.L. Forwarded | 28.00 | 60.33 |
| Total | 927.13 | 563.62 |
| Carloads received | 2,298.24 | 3,816.45 |
| Carloads forwarded | 9,238.68 | 4,571.46 |
| Total | 11,536.92 | 8,387.91 |
| Ticket sales | | 70.33 |
| Western Union | | 12.36 |
| Cream shipments | | 119.84 |
| Express shipments | | 134.46 |
| Total business 1940 | | 9,288.52 |
| Station expense 1940 | | 1,778.16" |

The carloads received and forwarded during the first eleven months of 1940, *character of commodity, origin and destination* of shipments, are as follows:

"CL Received:

| | | |
|---|---|---|
| January | — | None |
| February | — | 1 Dragline from Boise |
| March | — | None |
| April | — | 16 Feeder Cattle (13 from Burns, Ore., 1 from Payette, 2 from Parma) |
| May | — | 1 Wheat from Harrington, Wash. |
| | | 5 Sheep from Irrigon, Wash. |
| June | — | 1 Poles from Priest River, Ida. |
| July | — | 2 Poles (1 from Priest River, Ida., 1 from Sand Point, Ida.) |
| August | — | None |
| September | — | 1 Coal from Kenilworth, Utah |
| October | — | 2 Feeder Cattle (1 from Cascade, 1 from Arling) |

```
                    1 Coal from Kenilworth, Utah
                    1 Power Shovel from Chicago
November    —       None
   Total    —  31 Cars
CL Forwarded:
   January  —    2 Sheep to Parma
   February —    1 Cattle to Portland
   March    —    2     do.
   April    —    2 Cattle to Burns
   May      —    7 Cattle to Cascade
                2 Cattle to Portland
                9 Sheep to Belvidere
                2 Sheep to Omaha
   June     —    2 Cattle to Portland
                1 Sheep to Omaha
   July     —    5 Cattle to Portland
                1 Sheep to Omaha
   August   —    2 Cattle to Portland
                1 Steers to Caldwell
                2 Sheep to Omaha
                1 Wheat to Ogden
   September —   2 Wheat to Ogden
                3 Cattle to Portland
   October  —    1 Cattle to Portland
   November —    1 Cattle to Caldwell
                1 Cattle to Portland
   Total    —  50 Cars"
```

The supplemental report made for the corresponding months of 1941 shows a total business for the first eleven months of the year as follows:

```
"LCL Rcd. ................................................ $   510.87
   "    Fwd. ...............................................      72.13
CL Rcd. ...................................................   3,843.03
   "    Fwd. ...............................................   5,474.68
Tickets  .......................................................      45.21
Western Union ..........................................      26.32
Cream ........................................................      70.12
Express  ...................................................     178.59
                                                            ─────────
   Total  ..................................................$10,220.95"
```

It thus appears that the receipts from CL lot shipments *received* for 1940 were $3816.45 and for 1941, $3843.03; and for CL lot shipments *forwarded* in 1940, $4571.46 and for 1941, $5474.68.

Eliminating from consideration CL lot shipments, leaves only $563.62 received for 1940 for LCL shipments and $583.00 for 1941 for LCL shipments, as against $1778.16, expense of maintaining agency in excess of expense of a caretaker.

The evidence shows that on shipments moving into Montour, the shipping station should have "at least 50%" of the tolls collected; and the same is true with reference to division of receipts for tolls received on shipments out of Montour. In other words, the station charges at forwarding stations are equaled by the station expense at the receiving station; so that approximately only 50% of the freight charge for these shipments, whether CL or LCL, may be properly credited to Montour.

It is plain, from the table of receipts herein set out, that the income from passenger fares, telegraph and express service, all together, is inconsequential, ($336.99 for 1940 and $320.24 for 1941) ; and of this, only the telegraph tolls would be affected by the proposed change of service. Messages can readily be phoned to Emmett (18 miles south) or Horseshoe Bend (8½ miles north) where agencies will still be maintained.

■ It seems to be generally admitted that "The principal need of an agent is occasioned by less than carload business." (*Denton Bros. v. Atchison, T. & S. F. Ry. Co.,* 34 N. M. 53, 277 P. 34, 36; *Kurn v. State,* 175 (Okla.) 379, 52 P. (2d) 841; Petn. of Town of Grenville, 46 N. M. 3, 119 P. (2d) 632, 635; In re Denver & R. G. W. Co., 36 N. M. 106, 9 P. (2d) 139, 140; In re Southern Pacific Co., 37 N. M. 11, 16 P. (2d) 402, 406) ; and that in agency discontinuance cases, "carload freight is not to be considered, because an agent is not needed for carload freight." (*Louisiana Ry. & N. Co. v. Railroad Comm.,* 146 La. 609, 83 So. 849; *Southern Ry. Co. v. Pub. Service Comm.,* 195 (S. C.) 247, 10 S. E. (2d) 769, 776; In re Denver & R. G. W. R. Co., supra ; In re So. Pacific Co., supra.)

It appears that a caretaker can furnish all the service reasonably necessary for CL lots at such stations as Montour.

■ We doubt, however, whether the items of income from business done at a single country station, on a great transportation system like the Union Pacific Railroad Company, is entitled to a major consideration, for the reason

that the system is constructed and the franchises are granted and acquired for service to the whole public; and the more prosperous and remunerative communities are bound to pay some revenue to equalize the burdens of service to the more remote and less prosperous communities through which the system operates. (Application of Thomson (Neb.) 6 N. W. (2d) 607, 609; see, also, *Southern Ry. Co. v. Pub. Service Comm.*, 195 (S. C.) 247, 10 S. E. (2d) 769.)

The statute (Sec. 59-302, I. C. A.) relating to the Duties of Public Utilities, provides as follows:

"Every public utility shall furnish, provide and maintain such service, instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees and the public, and as shall be in all respects *adequate, efficient, just and reasonable.*" (Italics supplied.)

In arriving at a conclusion as to what constitutes "adequate, efficient, just and reasonable" service in any particular case, the relative rights of the utility and the public must be taken into consideration, for, under some circumstances, each may have to suffer some inconvenience or loss. A particular service by a public utility may be *reasonable* in a small, non-commercial community which would be wholly inadequate and inefficient in a commercial or manufacturing community. (*Murray v. P. U. C.*, 27 Ida. 603, 150 P. 47, 47 L. R. A., 1916F 756; *Taylor v. U. P. R. Co.*, 60 Ida. 185, 89 P. (2d) 1005; *Wash. O. R. & N. Co. v. Fairchild*, 224 U. S. 510, 56 L. ed. 863.)

We feel satisfied by the record before us, that the substitution of a caretaker, or nonagency, for the agency service, which has heretofore been maintained by the company at Montour, will be no material or substantial detriment or loss to the people of the community served and, at the same time, will slightly lessen the expense of maintaining that station and will release a telegraph operator for a more urgent and necessary service at this time of public emergency, when experienced operators are much needed. Under the statute, the agency service may be restored whenever changed conditions and circumstances will justify the requirement. (Sec. 59-629, I. C. A.)

The order is vacated and the cause is remanded to the commission for further proceedings in accordance with the views herein expressed. No costs awarded.

Holden, C.J., Budge, Givens, and Dunlap, JJ., concur.