MISSOURI–KANSAS–TEXAS RAILROAD COMPANY OF TEXAS et al., Appellants,

v.

Pessell FOWLER et al., Appellees.

No. 10385.

Court of Civil Appeals of Texas.

Austin.

April 25, 1956.

Rehearing Denied June 6, 1956.

John Ben Shepperd, Atty. Gen., J. Milton Richardson, Asst. Atty. Gen., for Railroad Commission of Texas.

Dan Moody, Dan Moody, Jr., Austin, for Missouri-Kansas-Texas R. Co. of Texas.

Tisinger & Sloan, Austin, for appellees.

HUGHES, Justice.

Pessell Fowler and nine other residents of the Pflugerville area in Travis County sued the Missouri-Kansas-Texas Railroad Company of Texas, hereinafter called Katy, the Railroad Commission of Texas and its members to vacate an order of the Commission authorizing the Katy to discontinue its agency at the station at Pflugerville except for a period of not less than three months during the cotton shipping season and for appropriate injunctive relief.

A jury heard the case but was dismissed after the evidence was closed the court ruling that there were no disputed material fact issues.

This ruling was preceded by the court's action in severing from and dismissing for want of jurisdiction that portion of the suit in which plaintiffs' alleged and sought relief based on a contractual obligation binding the Katy to build and permanently maintain a depot and agent at Pflugerville.

The trial court rendered judgment decreeing the order of the Commission void and enjoining its enforcement.

All parties have appealed, Fowler et al. complaining only of the order of severance and dismissal.

The court below made these fact findings:

"(1) As a matter of fact, as well as law as hereinafter stated, the order of the Railroad Commission has no support in any evidence.

"(2) The station at Pflugerville is operating profitably; the agency at such station is profitable.

"(3) Public convenience and necessity require the maintenance of the agency twelve months out of the year.

"(4) It will not unduly or unreasonably burden the railroad to continue the agency."

Consistent conclusions of law were made and filed.

The Katy, whose brief has been adopted by the Commission, has made fifteen separate points the basis of its appeal but inasmuch as they are grouped for briefing they will not be stated or treated separately.

Katy operates a railroad line through the unincorporated town of Pflugerville in Travis County, Texas, and has maintained a station and an agent at that place since early in this century. Since and for some time prior to 1951 the agent at Pflugerville has been on duty eight hours a day, Monday through Friday of each week, throughout the entire year (except for holidays). In 1951 the Katy applied to the Commission for permission to discontinue the agency for at least the period of the year not included in what is known as the cotton shipping season, a period in the late summer and fall of the year during which most of the cotton is shipped. After the first hearing, permission was denied by the Commission.

A second application of the same type was made in 1953, the result of which was the order complained of in this suit.

The community of Pflugerville has been established for many years. It has schools, churches, drug stores, grocery stores, hardware stores, cafes, lumber yards, a bank and the other kinds of commercial establishments commonly found in a thriving community. In the town proper there are 450–500 people. In the trade area of Pflugerville, there are approximately 2500 persons. The high school and elementary schools combined have 350 scholastics.

The depot receives and discharges at Pflugerville all of the necessities of life, including food-stuffs, medicines, lumber, livestock, feed cotton, oil products, iron and steel, cream, chickens, turkeys, hardware, etc.

There is no regular freight service in and out of Pflugerville except on the railroad operated by the Katy. This service includes six trains per day. No truck or bus lines are operated on any regular schedule in or out of Pflugerville.

The nearest station from Pflugerville on the north is Georgetown, and on the south, the nearest station is Austin. Georgetown and Austin are more than twenty five miles apart on the Katy lines.

There is also evidence that a full time agent at Pflugerville is needed in order to issue bills of lading, sell tickets, give information, receive complaints, send telegrams, care for chickens and livestock and to perform other services usually performed by a station agent.

There is evidence, too, that Pflugerville would suffer economically if the services of the agent are curtailed as the order of the Commission authorizes.

The primary contention of Katy is that it is under no legal duty to maintain an all year round agency [1] at Pflugerville.

Fowler et al. counter with the assertion that a service once undertaken or assumed by a railroad cannot be discontinued saying "This is a fundamental common law rule."

---

1. An "agent" or "agency" in railroad parlance means more than a representative. It means a person with authority to perform certain specific duties for the railroad in connection with the handling of freight and the transportation of passengers.

We will discuss the authorities cited to support this statement.

Vol. 34 Tex.Jur. p. 714–716 is cited and the only authority in support of the text is the opinion of this Court in State v. Sugarland Railway, Tex.Civ.App., 163 S.W. 1047, 1048, writ refused. This case holds that a railroad cannot abandon any of its lines without statutory authority and construed our statutes "to indicate that no such power was ever contemplated."

To the same effect is State v. Enid, O. & W. Ry. Co., 108 Tex. 239, 191 S.W. 560, reliance being placed upon a statute in existence when the railroad was chartered prohibiting removal of main lines once constructed.

Crosbyton-Southplains R. Co. v. Railroad Commission, Tex.Civ.App., Austin, 169 S.W. 1038, writ refused, upholds the validity of a statute requiring railroads to build sidings and spur tracks sufficient to handle the business tendered such railroads, when ordered to do so by the Railroad Commission.

In Angelina & N. R. R. Co. v. Railroad Commission, Tex.Civ.App., San Antonio, 212 S.W. 703, 707, writ refused, the Court held that an order of the Railroad Commission requiring a railroad to provide and maintain at a station on its lines adequate depot facilities and to place an agent in charge thereof was sustained, the Court saying:

"All that appellee sought to do was to compel obedience to a mandatory statute which commanded appellant to build a suitable house to accommodate its passenger and freight traffic at Etoile. There was nothing unreasonable or unjust in a request that appellant should obey the laws of the state which created it; such laws being read into and becoming a part of the instrument that gave it existence—its charter."

"While the statutes bearing on railroads do not in terms require agents to be furnished at railway stations and do not in terms authorize the Railroad Commission to make such appointment, it becomes a duty, and such authority arises by imperative implication from the many duties placed upon railway companies and the authority given the Railroad Commission to enforce compliance with such duties. The statutes require that freight shall be delivered to the owner, agent, or consignee, that baggage shall be checked when taken for transportation 'by the agent or servant of such corporation'; that they shall erect suitable buildings at stations for the protection of passengers and freight, and shall keep depots or passenger houses lighted and warmed and open to egress and ingress of all passengers for an hour before the arrival and after the departure of trains, and other duties which cannot be performed without the presence of an agent or servant. The Railroad Commission is given special and plenary power, not hampered as in the fixing of rates by the reasonableness of them, to require compliance with the terms of article 6693 [Vernon's Ann.Civ.St. art. 6498] as to providing and maintaining 'adequate, comfortable and clean depots and depot buildings at their several stations for the accommodation of passengers, and to keep said depot buildings well lighted and warmed for * * * the accommodation of the traveling public.' The depot buildings could not be automatically lighted and warmed, but the presence of an agent or servant would necessarily be required to perform those duties. The authority to require compliance with the statute would be futile and vain if it did not carry with it the authority to require the presence of such agent or servant."

Also cited are Fordyce v. Manuel, 82 Tex. 527, 18 S.W. 657 and Mills v. Missouri K. & T. R. Co., 94 Tex. 242, 59 S.W. 874, 55 L.R.A. 497.

Fordyce holds, in a damage suit for being ejected from a train for not having a ticket, that in order to comply with a statute

(present Art. 6416)[2] requiring ticket office to be open for a stated time before departure of a train that an agent must be in the office to sell tickets. Mills is of similar import.

The statute involved in those cases expressly recognizes that there may be stations not having agents authorized to sell passenger tickets because a certain rate is prescribed "except from stations where no tickets are sold."

Several other Texas cases are cited by Fowler et al. in their list of supplemental authorities but we need not name or discuss them because they involve water, light, telephone and gas companies and which, for the most part, pertain to the right of the utility company to discontinue service for failure to pay charges, such matters being foreign to this suit.

Three United States cases are cited: Wisconsin, M. & P. R. Co. v. Jacobson, 179 U.S. 287, 21 S.Ct. 115, 45 L.Ed. 194, Atlantic Coast Line Railroad v. North Carolina Corporation Commission, 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, Missouri Pacific Railroad Co. v. State of Kansas, ex rel. Taylor, 216 U.S. 262, 30 S.Ct. 330, 54 L.Ed. 472.

In each of these cases the order of the State regulatory body having jurisdiction requiring the respective railroad companies to perform some public duty incident to its operation as a railroad was sustained as not being unreasonable or arbitrary the Court in Atlantic saying [206 U.S. 1, 27 S.Ct. 595]:

"Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. As the duty to furnish necessary facilities is coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance."

In no case cited by Fowler et al. has an order of a State regulatory body relaxing services to be performed by a railroad been voided.

We now note the statutes which Fowler et al. contend require performance of services by Katy which cannot be performed in the absence of an agent or which imply the necessity of an agent.

Arts. 6355, 6356. These statutes provide that railroad companies shall survey their route and designate depot grounds before commencing their roadbed for each twenty five miles and that no company shall change its route or depot grounds after such location.

Art. 6369 provides that a check shall be affixed to all baggage transported by the "agent or servant" of the railroad.

Art. 6395 requires railroads to keep its "depots or passenger houses" lighted and warmed and opened to passengers one hour before arrival and one hour after departure of passenger trains.

Art. 6396 requires railroads to provide and maintain toilet facilities.[3]

Art. 1376, Penal Code, and Art. 889 require carriers of livestock and poultry to feed, water and otherwise care for them.

Art. 6393 requires railroads to erect at each depot or station suitable buildings for the reception and delivery of freight of all descriptions so as to protect such freight from the weather, etc.

Art. 6416, relating to ticket offices, has been discussed in connection with our consideration of the case of Fordyce v. Manuel.

2. All statutory references are to Vernon's Annotated Statutes and are to the Civil Statutes unless otherwise indicated.

3. A railroad was held not to violate this statute by failure to provide such facilities at a station where there was no building. State v. Texas & P. Ry. Co., Tex.Civ.App., Dallas, 173 S.W. 900.

Art. 6448 prescribes certain duties of the Railroad Commission, Fowler et al. citing the requirements of its Sec. 10 reading:

"Require each railway subject to this title to provide and maintain adequate, comfortable and clean depots and depot buildings at its several stations for the accommodation of passengers; and to keep them well-lighted and warmed for the comfort and accommodation of the traveling public; and keep and maintain adequate and suitable freight depots and buildings for the receiving, handling, storing and delivering of all freight handled by such roads and such railway, and to obey the requirements of the Commission in respect thereto."

See also Art. 6498 which relates to similar requirements and which expressly provides:

" * * * the Commission shall require railroad companies to comply fully with the provisions of this law under such regulations as said Commission may deem reasonable."

Art. 1669, Penal Code, relates to the duties of a train dispatcher at stations having telegraph offices and requires relay of informations relating to movement of trains to the station agent and Art. 1670, Penal Code, requires the agent to keep and post a bulletin board regarding time of arrival of passenger trains.

Art. 6481 provides that freight cars may be obtained by a shipper upon written application to any "superintendent, agent, or other person in charge of transportation" and Art. 6497 provides:

"It shall be deemed prima facie a reasonable time within which to order cars that any shipper shall give written notice thereof to the station agent at the place of shipment, or in his absence, to the nearest station agent of the railroad company to which such application is made, three days before such shipment of five cars or less, and five days for less than ten or more than five cars, and eight days for ten cars or more. The railroad companies shall furnish their station agents with printed blanks upon which shippers make application for their cars."

Art. 1674, Penal Code, requires that railroads:

" * * * upon the receipt of freight for transportation shall issue bills of lading therefor, and authenticate, validate or certify such bills of lading, when the same shall be demanded by the shipper, in accordance with the provisions of this chapter."

and Art. 1677, Penal Code, provides that:

"The carriers affected by this chapter shall keep posted for public inspection in some conspicuous place in the station or place where freight is received an instrument of writing, authorizing the agent of such carrier, or person authorized to act for such carrier, selected for such purpose, to execute, sign and issue bills of lading; and the agent, or person so authorized to act for said carrier, so selected, shall attach his signature to such instrument in the same manner that he signs bills of lading."

As to most of the above statutory duties Katy will employ a local caretaker who will be on duty two hours per day and who in conjunction with trainmen will undertake their performance.

As to issuance of bills of lading the procedure is more complex and to show what is proposed we quote from the testimony of Katy's South Texas Division Superintendent, F. H. Schaller:

"Q. Now, I would like for you to tell us how a man desiring to ship from Pflugerville, and a person desiring to receive shipments, would do so under caretaker operations. We would take first a person who desires to ship a carload lot from Pflugerville during the nine months of the year, how would he go about it? A. He would call either the agent at Georgetown or the agent at Austin collect, and then the agent would order a car for him and make out the bill of lading and send him his copy.

"Q. Could he notify you of that by mail if you so desired? A. Yes, sir.

"Q. By mail or collect call? A. Yes, sir.

"Q. And the car would be made available to him at Pflugerville at the time he specified? A. Yes, sir.

"Q. All right. Now, how about a man who wanted to receive a carload lot at Pflugerville? A. Well, it will be a prepaid station during the nine months of caretaker operations—everything has to be prepaid into Pflugerville, and the waybill for that shipment would be left at either Georgetown or Austin, probably Georgetown, coming south, and the agent at Georgetown would either call the consignee that he had received the shipment or send him a post card. He would probably do that anyhow if he phoned him, confirm it by postal card.

"Q. So, in other words, there is nothing to prevent a man receiving a carload lot at Pflugerville with caretaker operations; is that correct? A. That's correct.

"Q. Now, take a man who wanted to ship in less than carload lots from Pflugerville, how does he make his arrangements? A. He goes through the same procedure.

"Q. How about a man who wants to receive less than a carload lot? A. The same procedure.

"Q. I would like to go into a little more detail on these methods of shipment. Now, the man who ships from Pflugerville, he will have to make arrangements by telephone call or mail to Austin or Georgetown? A. That's right.

"Q. What about paying for that shipment? A. Paying the freight for that shipment?

"Q. Yes, sir. A. He would have —well, he could go to Georgetown and pay for that shipment or make it collect.

"Q. In other words, there would not be an agent at Pflugerville during nine months to receive payment for it? A. No, sir.

"Q. So he would have to make payments otherwise, but he could go ahead and ship his stuff C.O.D.? A. Yes, sir.

"Q. What about the man receiving freight at Pflugerville? A. Well, Pflugerville, as I stated before, would be a prepaid station, and the charge would be paid at the point of origin.

"Q. So, in other words, a person who wanted to receive something C.O.D. would have to receive it through Georgetown or through Austin? A. Yes, sir.

"Q. Well, now, would it be a fair statement to say that there is no denial of the use of the railroad's facilities at Pflugerville by caretaker operations, but it does mean that a person desiring to receive shipments there is going to be inconvenienced as far as C.O.D. shipments are concerned? A. Yes, sir.

"Q. And a person desiring to ship from there is going to be inconvenienced in so far as he wants to ship prepaid? A. Yes, sir.

"Q. That is the extent of the inconvenience with the caretaker operation? A. That's right, yes, sir.

"Q. Now, but that would be the status only when there is not an agent there—in other words, during the cotton shipping season there would be an agent there just as now? A. Yes, sir.

"Q. And they would be able to get their bills of lading or whatever else they needed, is that correct? A. That's correct."

As we read these various statutes and as we understand the decision in Angelina & N. R. R. Co. v. Railroad Commission, supra, it is incumbent upon Katy and other railroads to render the services called for in the statutes but that there is

no express or mandatory statute providing that only an agent would render them.

In Crosbyton-Southplains R. Co. v. Railroad Commission, Tex.Civ.App., Austin, 169 S.W. 1038, 1042, writ refused, it is said:

"Under the common law, which is expressly declared to be in force in this state as to carriers (article 707, R.S. [Vernon's Ann.Civ.St. art. 882]), it is the duty of railroads to furnish reasonable facilities for the transaction of public business. Our statutes in reference to building depots, keeping them lighted and warmed, etc., are but legislative declarations of what is deemed necessary for railroads to do in order to discharge their common-law liabilities.

"It cannot be doubted that the Legislature has the power to leave it to the discretion of the Railroad Commission as to the manner in which such duties shall be performed, including the time when, and place where, specific facilities shall be furnished; a precaution against the abuse of such discretion being provided by permitting an appeal to the courts."

■ Absent any specific direction from either statute or rule or order of the Commission the railroad itself must initially exercise its own discretion in the management of its internal affairs in performance of its public duties.

The power and duty of the Railroad Commission to regulate railroads is plainly written into our statutes. Arts. 6445–6446, 6448, 6498, 6357, V.A.C.S., and perhaps others.

Regarding the many duties prescribed in Art. 6448 the Court in Railroad Commission of Texas v. Galveston Chamber of Commerce, 105 Tex. 101, 145 S.W. 573, 579, said:

"It is apparent that it was the purpose of the Legislature to confer upon the Railroad Commission ample powers and a liberal discretion over this important matter. Indeed, the character

and importance of the business of transportation of freight and passengers in the extensive and varied territory placed under the control of the Commission could not be successfully handled by fixed rules of law. The varied interests to be served and the many difficulties to be overcome, as well as conflicting interests to be properly adjusted demanded flexible rules. The Railroad Commission was constituted an independent department of the government which should represent the interests of the people and the railroads, and to the accomplishment of that purpose the courts will contribute a just and liberal interpretation of the law."

See our quotations from Missouri, K. & T. Ry. Co. of Texas v. State, Tex.Civ.App., Austin, 275 S.W. 673, writ refused, in Colorado River Western Ry. v. Texas & New Orleans R. Co., Tex.Civ.App., 283 S.W.2d 768, 778, writ ref. N.R.E., which in speaking of the Commission states, in part, that "Railroad regulation in every respect is within its jurisdiction." See also San Antonio & A. P. R. Co. v. Railroad Commission, Tex.Civ.App., Austin, 275 S.W. 261.

■ "Regulation" is not, as Fowler et al. urge, restricted to the duty of maintaining the status quo. It encompasses the power to intensify as well as the power to relax the manner in which a railroad performs its public duties.

■ We have no doubt but that the Commission was acting within its jurisdiction in hearing and determining the matter in issue.

■ Our next inquiry is to appraise the order of the Commission under the substantial evidence rule.

We have previously indicated the nature of inconveniences which the Pflugerville community will sustain and have noted the economic loss it will suffer in the event the order of the Commission is upheld. We will not further detail these matters but will

pass to a consideration of the evidence relied upon by Katy to support such order.

Katy has several exhibits in the record pertaining to the financial aspects of the Pflugerville agency and their relation to the entire Katy system. Exhibit (Defendants) No. 2 shows the ratio in terms of per cent of the agent's salary at Pflugerville to the total gross revenue of Katy from business transacted at Pflugerville as compared to the ratio between total salaries of all agents, including aides in larger cities, and the system's total revenue for five years and five months commencing in January, 1949.

This exhibit reveals that the ratio of all agents' and aides' salaries to the system's total revenue is an average of 6.67 per cent for the sixty five months period.

The ratio between the salary of the Pflugerville agent and the Pflugerville station revenue was 54.6 per cent for the full five years and over 50 per cent for the sixty five months. In no month was the ratio less than 13 per cent and in over half of the months the ratio was over 100 per cent. The smallest percentages occur in the fall months when the cotton season is in progress.

Exhibit 1 (Plaintiffs) shows all the revenues which the Katy system received in connection with shipments originating or terminating at Pflugerville as well as incidental revenues of such station. Such exhibit also shows the expenses of the Pflugerville station consisting of agent's salary and tax thereon and water and ice.

This exhibit reflects that the total revenue in any way connected with the Pflugerville station was insufficient in thirty six of the sixty five months covered to pay the salary of the agent and that excepting the three months cotton season such revenues were sufficient to pay the agent's salary in less than one third of the months.

It is true that Exhibit 1 shows an excess of receipts over expenses. It must be observed, however, that this exhibit represents the maximum revenues at Pflugerville and the minimum expenses.

It is obvious that all of the revenues received at Pflugerville are not all properly allocable to that station in determining its profitable standing. It is equally obvious that the expenses of operating a railroad are not limited to the salaries of agents.

As to the first situation, where shipments move entirely on the Katy, some courts, since two stations are involved, have adopted the rule that gross revenues of a station must be reduced by half in determining whether a station is making money. Lowden v. State, 189 Okl. 495, 118 P.2d 242; Kurn v. State, 175 Okl. 379, 52 P.2d 841; Petition of Town of Grenville, 46 N. M. 3, 119 P.2d 632; Seward v. Denver & R. G. R. Co., 17 N.M. 557, 131 P. 980, 990, 46 L.R.A.,N.S., 242; In the Matter of the Application of the Union Pacific R. Co., 64 Idaho 529, 134 P.2d 599; In re Thomson, 141 Neb. 697, 4 N.W.2d 756; Southern Ry. Co. v. Public Service Comm., 195 S.C. 247, 10 S.E.2d 769.

We are not advised that the fairness of this rule has ever been questioned.

As to the expenses of operating railroads the evidence is that at least 70 per cent of every revenue dollar goes for operating expenses other than the payment of salaries of agents.

The agent at Pflugerville testified that except for the three months cotton season the business and his duties are very light and that on a normal day his duties require less than one hour of work.

There is evidence that the revenues at the Pflugerville station have shown an upward trend over the past five years. Fowler et al. say this portends a bright future for Katy in Pflugerville. Katy attributes the increase to higher rates.

On the darker side there is evidence that the population of the Pflugerville community is decreasing.

■ We do not ourselves weigh all of the evidence in the record and decide whether a part time agency should or should not be authorized in Pflugerville. This was the prerogative of the Commission and one

which we have neither the authority nor desire to usurp.

We have concluded, from a consideration of all the evidence, that the order of the Commission has reasonable support in substantial evidence.

Our greatest difficulty has been in reconciling the statutes relating to bills of lading with the somewhat makeshift plan of Katy for coping with the problems created. Whether the plan in operation will prove so burdensome as to be impractical and unreasonable we are unable to say now as a matter of law. The Commission will of course be open for redress if experience proves the order to be arbitrary.

We overrule the contention of Fowler et al. that denial by the Commission in 1951 of an application similar to the one granted in this case constitutes res adjudicata. This problem is discussed at great length in 25 Texas Law Review, page 199.

The order in suit was made pursuant to the power of the Commission to regulate railroads. It was purely administrative in character, not judicial. It would be contrary to the public interest for the Commission to be forever bound by its decision as to the manner in which a railroad should be run when convinced that a prior rule or order was no longer in the public interest and should be changed. To hold res adjudicata applicable here would greatly impair the Commissions' statutory authority to regulate railroads.

We also overrule the point made by Fowler et al. that the order in question is void for indefiniteness and discrimination.

The cotton season is usually about three months. Sometimes it is early. Sometimes it is late. It is a matter of common knowledge in the community when it begins and when it ends. A fixed three months would be impractical.

The order is not discriminatory. The fact that cotton is the commodity causing the need for a full time agent in the fall is incidental. It is a question of business —not the kind of business creating the necessity.

There was no error in the action of the trial court in severing from this case that portion of the suit seeking to enforce a contract between Katy and some of the parties relating to the Pflugerville station. This being an appeal from the order of the Commission it was proper that the suit be confined to the validity of that order. The Commission was not concerned with and had no jurisdiction over any question relating to such contract.

The judgment of the trial court is reversed and judgment is here rendered that Fowler et al. take nothing by their suit, all without prejudice to the severed cause of action.

Reversed and rendered.

### On Motion for Rehearing

Our reference to Katy's Exhibit 1 is modified to this extent: Such Exhibit does not show amount of rent received by Katy for leased portion of its depot at Pflugerville; it does not show revenue from passengers alighting at such station and it does not include any credit for shipments originating at Pflugerville, billed to nearby stations subject to shippers' orders, who may at such time contemplate further shipment to interstate and international channels.

With this modification of our opinion appellees' Motion for Rehearing is overruled.

Motion overruled.