**RAILROAD COMMISSION OF TEXAS et al., Appellants,**

**v.**

**SOUTHERN PACIFIC COMPANY, Appellee.**

No. 11743.

Court of Civil Appeals of Texas, Austin.

May 20, 1970.

Rehearing Denied June 10, 1970.

Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., Pat Bailey, Acting Executive Asst. Atty. Gen., Thomas F. Sedberry and James M. Mabry, Asst. Attys. Gen., Austin, for appellants.

McKay & Avery, Denman Moody, Jr., John J. McKay, Austin, Baker, Botts, Shepherd & Coates, Edwin N. Bell, Houston, for appellee.

O'QUINN, Justice.

Southern Pacific Company (now merged into Southern Pacific Transportation Company) filed an application with the Railroad Commission seeking authority to discontinue its existing agency at Navasota, Texas, retire the depot, and change the applicable tariffs to show Navasota as a non-agency station.

By an order entered September 5, 1968, the Railroad Commission denied the application.

Southern Pacific filed suit in Travis County under Article 6453, Vernon's Ann. Tex.Civ.St., to cancel the order of the Commission and authorize discontinuance of the agency. The City of Navasota and interested civic groups sought to intervene in the case, but their petition was denied by the trial court.

The cause was heard by the court without a jury. After trial, the court held for Southern Pacific, setting aside the order of the Railroad Commission, in a judgment entered September 26, 1969. We affirm the judgment of the trial court.

The Railroad Commission brings three points of error. The Commission insists that this is a substantial evidence case, and that the single issue is whether the trial court's judgment is incorrect in holding that there was no substantial evidence to sustain the Commission's order.

Southern Pacific urges that the test is not whether the order of the Commission has reasonable support in substantial evidence, but whether the order was reasonable and just.

The trial court found:

"Based upon the entire record, the Court finds the law and the facts to be with the plaintiff [Southern Pacific] and against the defendants [the Railroad Commission and Commissioners], in that there is no substantial evidence to sustain the * * * order of the Railroad Commission of Texas, and in that said order

is unreasonable and unjust to plaintiff, and if permitted to stand, would have the effect of requiring plaintiff to maintain the Navasota agency at an unwarranted and needless expense to the railroad, which expense substantially exceeds the revenues from traffic at that station experienced in the past and reasonable to be anticipated in the future, all as shown by sound railroad accounting principles; and the Court further finds that under the evidence there is no public need for such agency and that the plaintiff has available other agencies, services and facilities reasonably adequate and sufficient to serve the public at Navasota in connection with the transportation services performed by plaintiff."

The Railroad Commission, through the testimony of four witnesses who were shippers using the Southern Pacific rail service in connection with businesses located in Navasota sought to show that the various functions of the railroad agent at Navasota so vitally affected the public convenience and necessity as to support the Commission's order denying discontinuance of the agency. Two other witnesses testified in general regarding efforts of the community to attract industry and gave their views as to the need of an agent in Navasota to handle shipments made through Southern Pacific rail facilities. One witness testified that loss of the agent would have an adverse effect on the community's image.

The services of the railroad agent that the shipper witnesses considered they could not conveniently do without and considered necessary to their businesses were in the main: (1) handling claims, (2) signing bills of lading, (3) obtaining cars needed for shipments, (4) spotting cars on tracks, (5) obtaining weight slips, (6) obtaining credit slips, and (7) obtaining refund slips.

It is undisputed that Navasota is a town having a population of about 4,900 and is served by three rail lines, including Southern Pacific. Each of the three lines maintains an agent in Navasota. Southern Pacific has two through freight trains daily and two switching units each day. The Southern Pacific agent in Navasota has had no duties related to passenger train service or mail service since 1958, and for the past several years the agent has performed no duties in connection with Western Union or Railway Express activities. Shipments in less than carload lots have been taken over by the motor truck division of Southern Pacific and the agent in Navasota since 1964 has not been permitted to perform duties in connection with these shipments.

The Navasota agent for Southern Pacific handles only duties related to carload shipments by rail. For many years, it was shown without dispute, the Navasota agent has had no duties connected with handling carload rail shipments of livestock and poultry requiring feeding and watering.

Southern Pacific proposed, in connection with its application to discontinue the agent at Navasota, to assign his duties to the existing agent at the Waller depot, which is 29.2 miles by rail and 31 miles by highway from the Navasota depot. The agent at Waller is now responsible for agent duties of five other communities and shipping points. With approval of the Navasota removal, the agent at Waller would be responsible for approximately fifty miles of track and six shipping points.

Southern Pacific further proposed to assign the several duties of the Navasota agent to other employees of the railroad. The bills of lading, after being prepared by the shipper, would be signed by the train conductor. If the customer preferred not to seal his own cars with seals provided for that purpose, the conductor would seal the cars.

To request other services now performed by the agent, the shipper would be allowed to make collect telephone calls to the agent at Waller. The shipper would use this means of ordering cars, obtaining rate and routing information, tracing and locating

rail cars, securing the timetable of the local or switching trains, and in reporting claims and getting inspections in connection with claims.

Southern Pacific represented the agent as a middle man in obtaining information on rates and routes and in tracing cars, this information being obtained presently by the Navasota agent from the Houston traffic office. The agent was represented also as the middle man in ordering cars from other points on the lines. All such duties would be handled by the Waller agent as middle man instead of by the Navasota agent in the same capacity.

Under the changes proposed by Southern Pacific, procedures would be no different from the present with respect to freight bills and remittances, which presently are handled from the Houston office by mail, and billing and paying of demurrage charges would be handled in the same manner by mail.

Testimony was offered that the present duties of the Navasota agent require less than two hours of work per day and that the Waller agent could absorb the added work. Southern Pacific introduced evidence of losses in revenues which would continue without the savings that might be effected by closing the agency at Navasota. It appears undisputed that the losses over a two-year period amounted to a minimum of approximately $4,158, although Southern Pacific introduced evidence tending to show losses of $10,986 to $13,880. Southern Pacific presented testimony that by transferring the duties of the Navasota agent to the agent at Waller a savings of $16,000 would be effected over the two-year period.

By its application, Southern Pacific sought to consolidate the accounting and clerical work on carload freight from Navasota to Waller and transfer the agent at Navasota to another station where a greater need existed. No change would be made in train service, nor would the train service be affected otherwise under the proposal.

Four public shippers testified in opposition to the application to discontinue the agency at Navasota.

G. S. Pierce, president of a Navasota company dealing in furniture, hardware, building materials, carpets and appliances, testified that his business had been a customer of Southern Pacific for twenty-five years. The company seldom ships goods but receives merchandise by rail, as well as by motor freight. During the two-year period beginning about October, 1966, and ending in September, 1968, his company received only four full cars of freight. In this period the company had one "stop car" every two to three months, these shipments being rail cars loaded with goods intended for several different destinations, with partial unloading occurring at each stop. The company was authorized to break seals and re-seal such cars without intervention of the agent.

Pierce testified that train crews for years had spotted cars without direction from the agent, and that the train crews knew where to spot incoming cars for opening. The numbers of the cars are furnished the company by telephone so that the right cars may be opened by the customer after being spotted by the train crews.

Pierce expressed concern about losing the services of the rail agent in handling claims, but stated that his company had had no carload claims in the two-year period prior to October, 1968. Claims on less than carload shipments, which the company receives by motor freight daily, according to Pierce, are not handled by the rail agent, but by Southern Pacific's motor transport agent.

In general, Pierce stated that his previous experience in dealing with railroad representatives located in other towns was not satisfactory and from this experience he considered local service preferable.

Phil Smith, a dealer in tractors, testified that in the two years from 1966 to 1968 he had received only four carload ship-

ments, in addition to six to eight stop cars each year. Smith stated he had not used Southern Pacific facilities as much as other rails since 1962, when one of his tractors was damaged because it rolled off a Southern Pacific dock. Smith had one claim in the two-year period. Although Smith testified he preferred talking in person, he admitted that he used the telephone in reaching the agent, and did not go to the agent in person.

Charles D. Jacoby, operator of an oil works warehouse in Navasota, testified that he ships 5,000 bales of cotton each year, and has need of the rail agent to sign bills of lading and to locate cars during the rush season when the demand for cars in high. At a figure of fifty bales of cotton to the car, Jacoby estimated that he shipped 100 to 120 carloads each year. Jacoby admitted that most of these shipments were by Missouri Pacific Lines and that in 1966 and 1967 he shipped "one or two cars" a year by Southern Pacific, although in 1968 he remembered "one order for twenty cars" by Southern Pacific.

Jacoby on cross examination admitted that the agents he used most of the time to get bills of lading signed were agents for Missouri Pacific and Santa Fe, and that in the two-year period, 1966–1968, he had made no "shipper order notify shipments" requiring the services of the Southern Pacific agent.

Jacoby testified that he seals his own cars for shipment and that train crews know where to spot cars. The witness testified he needed an agent to assist in getting cars, but further stated that "getting the cars is no problem." With reference to getting bills of lading signed, Jacoby conceded that if the train conductor, instead of the agent, executed the bills of lading and placed them in a designated box for convenience, this arrangement would solve the problem. "So long as we get it signed," Jacoby added.

John W. Stone, superintendent of a pole and post processing plant in Navasota,

testified from company records that the plant shipped or received 331 cars in 1967 and 421 cars in 1968 on Southern Pacific lines. Stone described the plant as a business receiving by rail or truck raw timber for processing and subsequently shipping processed materials to ultimate purchasers. The products include fence posts, utility poles, and lumber. The plant is located on the Missouri Pacific tracks, but the plant has transit traffic moving over Southern Pacific for interchange at the Missouri Pacific tracks. Stone stated that he or an assistant personally dealt with the Southern Pacific agent daily in shipping and receiving materials.

Stone outlined four areas of operation in which he considered the agent needed on a local basis. Stone named (1) the signing of bills of lading, (2) obtaining weight slips, (3) obtaining credit slips, and (4) obtaining refund slips. Signatures on the bill of lading expedite invoicing of customers, Stone explained. Since all rail rates are controlled by weight of shipment, cars must be weighed at the weigh station, located at Hearne, and Stone asks the agent to call Hearne for the weights, giving Stone a signed confirmation. Using the weight, the invoice to which is joined the executed bill of lading, can be completed and mailed. Existing Southern Pacific policy of mailing the official weight slip to Stone was considered by him acceptable for final confirmation but entails delay in invoicing customers.

Stone's company operates under tariffs calling for "treating in transit," which gives a through rate, even though the materials are unloaded and treated in Navasota. Southern Pacific introduced evidence that on inbound shipments to the plant the Southern Pacific zone office at Houston stamps the bills "good for transit" and mails the bills to the plant at Navasota. These bills become "credit slips" as between the plant and Southern Pacific, since the tariff provides that Stone's plant pays for the freight when delivered to Navasota, and, upon reshipment after processing,

credit for previous shipments to Navasota is allowed by the railroad. Stone considered the credit slip, obtained by him from the local agent, worth $150 to $200 "in pocket" to the plant.

Stone explained the importance to his company of refund slips in this testimony:

"Q * * * What is a refund slip in your business?

"A Well, there again, when we make those shipments out, we pay the full freight to SP Railroad outbound. Well, they have got our money from the inbound, and then they have got our money for the outbound shipments. Then we present them with a credit slip for—for the inbound freight, and they refund the money. That's what a refund slip is."

It was Stone's testimony that his plant relied on the local agent in processing both credit slips and refund slips.

Southern Pacific furnished evidence that when an outbound shipment is made, it becomes the shipper's duty to prepare the bill of lading and attach the inbound "good for transit" bill to it for credit. Southern Pacific proposed that these documents then be placed in a double-locked box in order that the train conductor, using his key on his lock, might obtain the bill of lading on the outbound shipment and sign it, leaving the customer a copy, and processing other copies. Southern Pacific contended that this procedure would cause no delay for the reason that, as Stone conceded in his testimony, the bill of lading cannot be signed by a Southern Pacific representative until Missouri Pacific places the loaded car on the transfer track. It was contended that, with the Southern Pacific conductor signing the bill as soon as the car is picked up, patrons will be able to get their copies as quickly as in the past, or perhaps more quickly.

P. F. Satterwhite, assistant superintendent of the Dallas division of Southern Pacific, testified that cars are never weighed until they reach Hearne station, from which station the weight tickets are mailed to the customer, or the weight may be telephoned to the patron without charge if desired by the shipper. The cars are not delayed for the weight information, but are moved on waybills with weights and charges to follow. Weight information, Satterwhite pointed out, can be processed as easily by the Waller agent as by the Navasota agent.

With respect to settling freight accounts, Stone testified that "for a good while" in the past he dealt with the Houston office of Southern Pacific, receiving bills for charges and remitting by mail. Southern Pacific proposed to follow the same procedure if the Navasota agent is removed.

Although Stone testified that it would be "some inconvenience" to him to deal with the agent at Waller, he stated that he "had no idea" how the plan outlined by Southern Pacific would work. Stone expressed his fear that the conductor, if allowed to sign bills of lading, might let a bill or credit slip "blow out of his pocket or something." Satterwhite testified that all such instruments are recorded in the Houston zone office, from which duplicates will issue, and the customer in no way could lose money because of loss or misplacement of papers. With reference to the "box system," under which the conductor and not the agent would handle bills of lading and credit slips, Stone testified, "I have never had any experience with the box system on the railroad. I have no idea how it will work." Satterwhite testified that the experience of Southern Pacific at numerous other stations had been satisfactory under systems similar to the proposed plan for Navasota in event the agent is discontinued.

■ Southern Pacific and other railroads are required to render the various services designated in the statutes, but there is no express or mandatory statute providing that only the agent must render such services. Missouri-Kansas-Texas Railroad Co. v. Fowler, 290 S.W.2d 922 (Tex.Civ.App., Austin, 1956, writ ref. n.

r. e.). "Absent any specific direction from either statute or rule or order of the Commission," this Court held in the Fowler case, "the railroad itself must initially exercise its own discretion in the management of its internal affairs in performance of its public duties." 290 S.W.2d 922, 930, col. 1.

■ We have reviewed the evidence with care and will appraise the order of the Railroad Commission under the substantial evidence rule. In our review and appraisal we observe the rules prescribed by the Supreme Court in such cases. If the findings and order of the Railroad Commission have any reasonable basis in fact, we may not substitute our judgment for that of the Commission. Shupee v. Railroad Commission of Texas, 123 Tex. 521, 73 S.W.2d 505 (1934).

■ We have concluded after consideration of all the evidence that the order of the Railroad Commission denying the application of Southern Pacific to discontinue its agency at Navasota is without reasonable support in substantial evidence.

Most of the duties at one time performed by the local agent in furtherance of the railroad's obligations to serve the public have been taken from him. With discontinuance of passenger service, a substantial portion of these duties were no longer required, such as ticket sales, depot maintenance, and handling the United States mail. Institution of motor trucking for less than carload shipments resulted in transfer of duties in connection with such traffic to employees of the motor transport division. The change to shipment of livestock and poultry by truck, and not by rail, made the agent's duties to feed and water these cargoes an obsolete requirement of the statute. The Navasota agent no longer handles Western Union messages or shipments by Railway Express.

The evidence is undisputed that the Navasota agent's assigned duties are limited to matters pertaining to carload shipments. The need for the agent to observe cargoes slightly damaged or that have shifted in transit was minimal under the testimony of the shipper witnesses. The spotting of inbound cars customarily is handled by the train crews, and the witnesses agreed that the crews knew where and how to spot the cars. Numbers of the cars being spotted may be obtained by a call to the agent at Waller as easily as by calls to the agent in Navasota.

Bills of lading, which are now signed by the agent, may be signed by the conductor without undue delay or inconvenience to the shipper, even with credit slips attached. Credit slips are furnished by the Houston office in advance of their need for attachment to the bill of lading, and cars are not delayed for weight slips, since the cars are moved on waybills, with weights and charges following. Freight accounts and refunds are processed through the Houston office and not by the agent.

With the customer authorized to break seals and open stop car shipments and to reseal the cars, services of the agent are not needed except to inspect damaged or shifted cargo. Incidents involving damage or shifting may be reported to the Waller agent by telephone. Since only one claim for the years 1966 to 1968 was made among the four shipper witnesses, it is apparent that services of the Navasota agent in connection with claims lacks importance.

Southern Pacific proposed a shifting of the few duties still performed by the Navasota agent to the Waller agent and to other employees of the railroad on a basis reasonably calculated not to change or suspend any duties of the railroad to the public. The railroad was able to show a loss under the existing arrangement and a substantial saving under the proposed plan entailing discontinuance of the agent at Navasota.

Although some of the few services the Navasota agent still performs may afford convenience to some of the shippers, we are unable to find in the evidence support

for the proposition that such services constitute a public necessity requiring that they be continued as ordered by the Commission. The railroad has made reasonable provision for the same services to be performed by other employees without causing a reduction or impairment of the services the railroad must render the public.

We affirm the judgment of the trial court.

Affirmed.